R.W. ET AL., APPELLANTS, V. DANIEL B. SCHREIN, M.D.,
APPELLEE, AND THE MEDICAL PROTECTIVE COMPANY
OF FORT WAYNE, INDIANA, GARNISHEE-APPELLEE.

652 N.W.2d 574

Filed November 1, 2002.    Nos. S-00-808 through S-00-812.

James E. Harris and Britany S. Shotkoski, of Harris, Feldman Law Offices, for appellants.

Mark A. Christensen and Pamela K. Epp, of Cline, Williams, Wright, Johnson & Oldfather, P.C., for garnishee-appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

PER CURIAM.

## NATURE OF CASE

Appellants in this case were, as children, patients of Daniel B. Schrein, M.D., an Omaha pediatrician. As adults, appellants brought actions against Schrein to recover damages for sexual abuse alleged to have been perpetrated by Schrein during the course of medical treatment. Appellants obtained default judgments against Schrein and commenced garnishment proceedings against Schrein's professional liability insurer, The Medical Protective Company of Fort Wayne, Indiana (Medical Protective). The district court concluded that appellants' claims were not covered by Schrein's insurance policy and entered summary judgment for Medical Protective. In *R.W. v. Schrein*, 263 Neb. 708, 642 N.W.2d 505 (2002) (*R.W. I*), we affirmed the district court's judgment. Appellants filed a motion for rehearing, which we granted. We again affirm the judgment of the district court.

## ISSUES ON REHEARING

In our first opinion, we affirmed the judgment of the district court, relying in part on the affidavit of Harlan C. Schriner, Jr., M.D., a pediatrician who opined that Schrein's actions did not constitute or arise out of professional services and that Schrein's actions thus did not breach any applicable standard of care. Appellants filed timely motions for rehearing, arguing in part that this court erred in relying on Schriner's affidavit because

the affidavit, although present in the record on appeal, had not been received into evidence by the district court. We granted appellants' motions for rehearing. We ordered that the issues on rehearing include all the issues originally briefed and offered the parties leave to file supplemental briefs addressing the following additional issues:

(1) Did the district court rule on appellants' objections to the affidavits of Schriner offered in each of these cases at the time the objections were made?

(2) If there were no rulings at the time of the objections, did appellants insist upon rulings prior to submission of the motions for summary judgment? If not, were the objections waived?

(3) Were the objections and/or the grounds upon which they were based addressed and resolved by the district court in its order of July 28, 2000, and if so, how were the issues resolved?

(4) Did the district court rule on appellants' alternative requests for a continuance pursuant to Neb. Rev. Stat. § 25-1335 (Reissue 1995) at the time the requests were made?

(5) If not, did appellants insist upon such rulings prior to submission of the motions for summary judgment? If not, were the requests for continuance waived?

## STANDARD OF REVIEW

■■■ Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Pinkard v. Confederation Life Ins. Co., ante* p. 312, 647 N.W.2d 85 (2002). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

■ The meaning of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the lower court. See *American Fam. Mut. Ins. Co. v. Hadley, ante* p. 435, 648 N.W.2d 769 (2002).

## ANALYSIS

### SCHRINER AFFIDAVIT

We turn first to the issues presented by the motion for rehearing. As set forth above, we granted rehearing on the issue whether Schriner's affidavit, on which our opinion relied, was properly received into evidence by the district court. We conclude that we are unable to resolve this issue on the record presented. The record does not show that the district court either explicitly ruled on appellants' objections to the affidavit or received the affidavit into evidence. This ambiguity in the record precludes us from relying on the affidavit or resolving any issues to which the affidavit might be relevant on appeal.

We note that the presentation of an adequate record for appellate review is primarily the responsibility of the parties. It is well established that a party who fails to insist upon a ruling to a proffered objection waives that objection. See, e.g., *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002); *Jameson v. Liquid Controls Corp.*, 260 Neb. 489, 618 N.W.2d 637 (2000). We have also stated:

> " 'If when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, or fails to object, *or to insist upon a ruling on an objection to the introduction of the evidence,* and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, *and the evidence is in the record for consideration the same as other evidence.'* "

(Emphasis in original.) *State v. Nowicki*, 239 Neb. 130, 134, 474 N.W.2d 478, 483 (1991) (quoting *In re Estate of Kaiser*, 150 Neb. 295, 34 N.W.2d 366 (1948)). See, also, *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991). That we have chosen, in this case, not to consider the disputed affidavit should not be taken to mean that we will not, in other cases, consider disputed evidence where an objection thereto has not been properly preserved by insistence upon a ruling on that objection. It is the responsibility of trial courts to rule on the objections presented to them. However, parties and counsel are cautioned that they

must insist on such rulings in order to preserve those objections; they fail to do so at their own peril.

The fact that Schriner's affidavit is not available for our review, however, does not change our ultimate conclusion from *R.W. I.* There is no factual controversy regarding Schrein's underlying conduct, which for purposes of this proceeding is assumed to have been as alleged in appellants' petitions. Similarly, the interpretation of a contract is a question of law. See *Hadley, supra.* Thus, we are presented with an integrated question of law—whether the allegations in the petitions set forth a claim for damages based on "professional services" within the meaning of the insurance policy. See, *Cluett v. Medical Protective Co.*, 829 S.W.2d 822 (Tex. App. 1992); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (Idaho App. 1984).

A medical professional such as Schriner can opine regarding a breach of the applicable standard of medical care, but cannot advise this court on a question of law, i.e., the meaning of a term in a contract. Our previous opinion erred in relying on Schriner's affidavit because the evidence was not relevant to the question presented to this court. After further consideration, we conclude that the dispositive question in this appeal is a question of law, on which expert testimony has no bearing. Therefore, we withdraw the section of *R.W. I* under the subheading "2. RENDERING OF 'PROFESSIONAL SERVICES,'" *id.* at 716, 642 N.W.2d at 512, and ends prior to the subheading "3. PUBLIC POLICY," *id.* at 721, 642 N.W.2d at 515. In its place, we substitute the following discussion of the issue:

RENDERING OF PROFESSIONAL SERVICES

■■■ The applicable language of the insurance policy issued to Schrein provides that Medical Protective will pay damages "based on professional services rendered or which should have been rendered . . . by the insured or any other person for whose acts or omissions the insured is legally responsible, in the practice of the insured's profession." An insurance contract is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. *American Fam. Mut. Ins. Co. v. Hadley, ante* p. 435, 648 N.W.2d 769 (2002). When the terms of a contract are clear, a court may not resort to rules of

construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Id.* While an ambiguous insurance policy will be construed in favor of the insured, ambiguity will not be read into policy language which is plain and unambiguous in order to construe against the preparer of the contract. *Id.* We conclude that the language of the insuring agreement is unambiguous. The determinative question, then, is whether Schrein's actionable conduct constituted "professional services" within the meaning of the policy.

■ This court has previously defined the term "professional services" in the context of a liability policy for professional negligence. *In Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), a physician's employee mistakenly poured benzine instead of water into a sterilization container, resulting in an explosion and a fire. The physician was insured by a policy covering damages arising out of " 'malpractice, error or mistake of the insured, or of a person for whose acts or omissions the insured is legally responsible . . . in rendering or failing to render professional services.' " (Emphasis omitted.) *Id.* at 13, 157 N.W.2d at 871. Noting that the precise question presented was whether the damages arose out of the rendering or failure to render professional services, we stated:

> The insurer's liability is thus limited to the performing or rendering of "professional" acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature or a "professional service" we must look

not to the title or character of the party performing the act, but to the act itself.

(Citations omitted.) *Id.* at 13-14, 157 N.W.2d at 871-72. Finding that the boiling of water for sterilization was "not a part of any patient's treatment per se any more than any other routine cleaning or arranging procedure incidental to the proper general operations of the plaintiffs' offices," we concluded that the act was not a professional service covered by the language of the insurance policy. *Id.* at 14, 157 N.W.2d at 872.

In *Marx, supra,* the determinative question was whether the act performed was "professional" as distinguished from the act of a layperson. In this case, however, the critical issue is whether the act performed is "professional" as opposed to unprofessional. In other words, the fact that the actions occurred between a doctor and patient is pertinent only if the act itself is of a professional nature. See *St. Paul Ins. Co. of Illinois v. Cromeans,* 771 F. Supp. 349 (N.D. Ala. 1991).

█ We recently revisited the *Marx* holding in *Iwanski v. Gomes,* 259 Neb. 632, 640, 611 N.W.2d 607, 613 (2000), which presented the question whether "a doctor commits malpractice by engaging in sexual relations or having consensual sex with an individual with whom the doctor concurrently maintains a physician-patient relationship." After recognizing our holding in *Marx v. Hartford Acc. & Ind. Co.,* 183 Neb. 12, 157 N.W.2d 870 (1968), we concluded that in order to establish that conduct by a physician constitutes malpractice, the acts of the physician upon which the claim is based must " 'be such as exacts the use or application of special learning or attainments of some kind' " that would constitute the " 'performing or rendering of "professional" acts or services.' " *Iwanski,* 259 Neb. at 641, 611 N.W.2d at 614 (quoting *Marx, supra*). In addressing whether the acts of the physician fell within this definition, we referred to case law from other jurisdictions interpreting "professional services" coverage in insurance contracts. We then stated:

We agree that the fact that sexual misconduct occurs in a medical professional's office "does not automatically transmute the act into a professional service [because the] location of an act's occurrence is not determinative of liability." *Lindheimer v. St. Paul Fire & Marine Ins.,* 643 So.

2d 636, 638 (Fla. App. 1994). When the only connection between the sexual misconduct and treatment is that the activity occurred in the medical professional's office, such a connection is too remote from the actual rendering of proper services to impose liability upon the medical professional for malpractice. See *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992).

We conclude, based on the foregoing rationale, that there must be a causal relationship between the alleged harm and the complained-of professional act or service. When there is a claim of medical malpractice based on unwanted sexual contact, the determination of liability should focus not solely on the locale of the alleged harm or the professional status of the actor, but, rather, on the context of the alleged medical service involved in the action. In other words, it is the physician's deviation from the recognized medical standard of care *during the course of treatment* that is the essence of a claim for medical malpractice, and *there must exist a causal relationship between the alleged harm and the complained-of deviation from that standard of care in order for liability to attach.*

(Emphasis in original.) (Emphasis supplied.) *Iwanski*, 259 Neb. at 642, 611 N.W.2d at 614. In applying this standard to the facts, we held that the relationship between the adult parties was consensual and that as to the only incident related to the direct provision of medical services, the evidence established that the sexual act between the patient and the physician took place well after the physician had completed a gynecological examination. We thus held that there was no actionable claim for "professional negligence." *Id.* at 643, 611 N.W.2d at 615.

Relying on our decision in *Marx, supra,* and consistent with our decision in *Iwanski, supra,* the clear majority rule among other jurisdictions is that outside the unique circumstance of mishandling the transference phenomenon in psychiatric counseling, sexual conduct is not a professional act or service for which medical malpractice insurance coverage is provided. See, e.g., *Snyder v. Major*, 789 F. Supp. 646 (S.D.N.Y. 1992), *modified* 818 F. Supp. 68 (S.D.N.Y. 1993); *St. Paul Ins. Co. of Illinois v. Cromeans*, 771 F. Supp. 349 (N.D. Ala. 1991); *Physicians Ins.*

*Co. v. Pistone*, 555 Pa. 616, 726 A.2d 339 (1999); *D.D. v. Insurance Co. of North America*, 905 P.2d 1365 (Alaska 1995); *N.M. Physicians Mut. Liability v. LaMure*, 116 N.M. 92, 860 P.2d 734 (1993); *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992); *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, 134 N.H. 141, 589 A.2d 130 (1991); *S. C. Med. Malpractice Liab. Ins. v. Ferry*, 291 S.C. 460, 354 S.E.2d 378 (1987); *Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130 (Minn. 1984); *American Casualty Co. v. Corum*, 131 Or. App. 445, 885 P.2d 726 (1994), *vacated on other grounds* 321 Or. 135, 894 P.2d 461 (1995); *Lindheimer v. St. Paul Fire & Marine Ins.*, 643 So. 2d 636 (Fla. App. 1994); *Steven G. v. Herget*, 178 Wis. 2d 674, 505 N.W.2d 422 (Wis. App. 1993); *Cluett v. Medical Protective Co.*, 829 S.W.2d 822 (Tex. App. 1992); *Standard Fire Ins. v. Blakeslee*, 54 Wash. App. 1, 771 P.2d 1172 (1989); *St Paul Fire Ins v Quintana*, 165 Mich. App. 719, 419 N.W.2d 60 (1988); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (Idaho App. 1984). See, generally, Annot., 60 A.L.R.5th 239 et seq. (1998 & Supp. 2002).

There is no dispute among appellate courts, even in those cases that find insurers to be liable for sexual contact, about the applicability of the holding in *Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968). Generally, cases that find sexual contact to be "professional services" do so by either (1) expanding the scope of the "act" to include the sexual contact or (2) lowering the requirement for causation between the act and the damages. There is no dispute that when a court is determining the coverage of a professional liability insurance policy, it must examine the nature of the act performed, rather than the title or professional character of the actor. *Niedzielski, supra.*

Based on these standards, courts have generally refused to require insurers to provide coverage for sexual acts, based on professional liability insurance policies with medical care providers, because sexual activity with a patient is not a part of the delivery of professional services or part of medical treatment. See *Snyder, supra.* When the physician's sexual contact with his or her patient is not necessitated by the particular course of medical treatment, then the malpractice insurance policy does not provide coverage for the damages sustained by the victim. *Blakeslee, supra.*

The most well-known statement of the minority rule is *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 720 P.2d 540 (Ariz. App. 1986). In that case, the Court of Appeals of Arizona articulated the following rationale for concluding that sexual assault was a "professional service":

> The claims of Dr. Asbury's patients that he manipulated their clitorises while performing routine gynecological examinations, if true, was tortious conduct committed while providing professional services and covered by his insurance policy. Most of the cases cited to us by St. Paul are distinguishable because the tortious sexual abuse of the patient was not intertwined with and inseparable from the services provided.

*Id.* at 567, 720 P.2d at 542. Accord, *St. Paul Fire & Marine Ins. v. Torpoco*, 879 S.W.2d 831 (Tenn. 1994); *St. Paul Fire and Marine Ins. Co. v. Shernow*, 222 Conn. 823, 610 A.2d 1281 (1992). The *Asbury* court adopted the rationale of the trial court in that case, quoting the trial court's opinion:

> "The question of insurance coverage does not turn on whether the conduct was negligent or intentional, or whether or not there was an assault and battery. Regardless of the category in which the underlying complaints are placed, they clearly allege tortious conduct while treating the patients, and seek damages resulting from the providing of professional services. Furthermore, the tortious conduct, if it occurred, took place in the course of and as an inseparable part of the providing of professional services. Consequently, any damages would be those resulting from the providing of professional services by the insured."

*Asbury*, 149 Ariz. at 566, 720 P.2d at 541. Accord, *Torpoco, supra*; *Shernow, supra*. See, also, *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 698 A.2d 9 (1997). But see, e.g., *St. Paul Ins. Co. of Illinois v. Cromeans*, 771 F. Supp. 349, 353 (N.D. Ala. 1991) (rejecting *Asbury* as "illogical"); *Physicians Ins. Co. v. Pistone*, 555 Pa. 616, 623, 726 A.2d 339, 343 (1999) (stating *Asbury* "has no basis in logic"); *N.M. Physicians Mut. Liability v. LaMure*, 116 N.M. 92, 97, 860 P.2d 734, 739 (1993) (uncertain of *Asbury* test's "workability or its support in public policy").

However, the *Asbury* rule has received significant criticism. First, it has been noted that in determining the scope of a liability insurance policy, the issue "is not whether the conduct in question is negligence, but whether a particular contract was intended to cover this conduct." *Snyder v. Major*, 789 F. Supp. 646, 650 (S.D.N.Y. 1992), *modified* 818 F. Supp. 68 (S.D.N.Y. 1993). See *Volquardson v. Hartford Ins. Co., ante* p. 337, 647 N.W.2d 599 (2002). The minority rule would be more logical if presented in the context of a tort action, i.e., expanding the set of wrongs from which tort victims should be protected. See *Snyder, supra.* However, where the issue is the scope of coverage under an insurance policy, expanding the meaning of "professional services" is inconsistent with our responsibility to give effect to the intent of the parties at the time the contract was written. See *Volquardson, supra.* In light of the case law set out above supporting the majority rule, along with our own decisions in *Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), and *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000), it is unlikely that parties entering into medical malpractice insurance contracts are operating under the assumption that the sexual misconduct of physicians may be covered by the malpractice insurance. It would decrease the likelihood of capturing the parties' intent to hold otherwise. See *Snyder, supra.*

Furthermore, the minority rule erodes the concept of legal causation until the requirement of proximate cause is essentially meaningless. As stated by one commentator:

The decisions that find coverage for allegations of sexual abuse or molestation against physicians and dentists do so only through flawed reasoning. They appear to apply what amounts to a simple "but for" test: Because the assault occurred during an otherwise proper and necessary medical procedure, the injury arose out of the performance of that professional service. Of course, the "but for" test is virtually boundless, as almost no subsequent event would take place were it not for some antecedent event, and as all events are, at some level, interrelated. It is simply unreasonable to conclude that conduct such as sexual molestation of a patient, which must be known to be only harmful and not beneficial, and which also must be known by the

doctor to further no preventive or corrective interest of the patient, is part of a professional medical procedure. It cannot, therefore, be part of the professional service that the doctor contracts with the patient to provide.

David S. Florig, *Insurance Coverage for Sexual Abuse or Molestation*, 30 Tort & Ins. L.J. 699, 727 (1995). This analysis, with which we agree, echoes some of the most basic and familiar concepts of tort causation.

"Proximate cause" . . . is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation." As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41 at 264 (5th ed. 1984 & Supp. 1988).

The majority rule, then, expresses a difficult truth: that appellants' injuries, in the instant case and most others, are not caused by any act of medical treatment that would normally be associated with the provision of a "professional service." The common thread running throughout the majority rule cases is the necessity for, and lack of, a direct causal link between appellants' damages and any legitimate medical treatment. "[T]here must be a causal relationship between the alleged harm and the complained-of professional act or service, that is, it must be a medical . . . act or service that causes the harm, not an act or service that requires no professional skill." *Roe v. Federal Ins. Co.*, 412 Mass. 43, 49,

587 N.E.2d 214, 217 (1992). Accord, *Lindheimer v. St. Paul Fire & Marine Ins.*, 643 So. 2d 636 (Fla. App. 1994); *Steven G. v. Herget*, 178 Wis. 2d 674, 505 N.W.2d 422 (Wis. App. 1993). "[T]here must be a causal relationship between the treatment (*i.e.*, professional services) and the harm alleged by the victim." *Standard Fire Ins. v. Blakeslee*, 54 Wash. App. 1, 10, 771 P.2d 1172, 1177 (1989) (citing *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (Idaho App. 1984)).

As most clearly stated by the Supreme Court of New Hampshire, "[t]he specified source out of which damages must arise, according to the terms of the insurance policy, is professional services rendered, or which should have been rendered." *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, 134 N.H. 141, 146-47, 589 A.2d 130, 133 (1991). The minority rule abrogates this principle.

The court in *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 720 P.2d 540 (Ariz. App. 1986), attempts to connect the plaintiffs' damages to professional services by asserting that the professional service "is intertwined with and inseparable from" the tortious conduct which was the actual direct cause of the plaintiffs' damages. However, the *Asbury* approach rests on the assertion that it is impossible to separate legitimate medical treatment from sexual assault. There may, in some cases, be a fact question presented as to whether the medical professional's conduct was, in fact, legitimate medical treatment. This does not mean, however, that we can conclude it is not possible for the trier of fact to separate legitimate medicine from a sexual assault, to determine which acts of the care provider were professional treatment and which were not, and then assess by which acts the plaintiffs' damages were caused. In any event, there is no fact question presented in the instant case as to which acts of Schrein caused appellants' damages, and none of those acts are within the scope of coverage of Schrein's liability insurance policy.

For the foregoing reasons, we reject appellants' contention that this court should follow the minority rule. Instead, we continue to adhere to the majority rule as indicated by our decisions in *Marx v. Hartford Acc. Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), and *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000). In

the instant case, the substance of appellants' allegations is that Schrein's behavior went beyond the scope of legitimate medical treatment and that their damages result entirely from actions that were not legitimated by any appropriate medical purpose. Appellants did not establish any harm attributable to any failure to properly diagnose or treat a medical condition. Rather, their injuries and damages resulted solely from the affirmative acts of abuse and molestation committed by Schrein under the guise of medical examination and treatment. Consequently, the "act" that caused each of appellants' damages was not medical treatment and not a "professional service" within the meaning of the policy.

## CONCLUSION

As previously indicated, the foregoing discussion is substituted for that section of our opinion in *R.W. I* in which we erred and which has been withdrawn. In all other respects, we continue to adhere to the reasoning and conclusions of *R.W. I*, as they pertain to appellants' remaining assignments of error on appeal and rehearing. For the reasons stated in *R.W. I* and this supplemental opinion, we affirm the judgment of the district court.

MOTIONS FOR REHEARING SUSTAINED.
FORMER OPINION MODIFIED.

WRIGHT and MCCORMACK, JJ., not participating.