# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1613

_____

Church Mutual Insurance Company

*Plaintiff - Appellee*

v.

Clay Center Christian Church

*Defendant*

Cheryl S. Green; Cheryl S. Green as Personal Representative of the Estate of John R. Green

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 19, 2013
Filed: March 25, 2014

_____

Before WOLLMAN, COLLOTON, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Cheryl Green and the Estate of John Green (the Greens) appeal from the district court's[1] grant of summary judgment in favor of Church Mutual Insurance Company (Church Mutual). The district court concluded that coverage for the injuries the Greens suffered because of their exposure to carbon monoxide was precluded by pollution exclusions contained in the relevant policies. The district court also held that Church Mutual was not estopped from denying coverage based on those exclusions. We affirm.

## I. Background

John Green was the pastor of Clay Center Christian Church (the Church). He and his wife, Cheryl, resided at the Church's parsonage. On November 19, 2009, the parsonage's heating system malfunctioned and released carbon monoxide throughout the residence. John died as a result of his exposure to the carbon monoxide. Cheryl suffered bodily injuries.

The Church had two policies issued by Church Mutual that are relevant to this appeal: a multi-peril policy and an umbrella policy. The multi-peril policy contained a pollution exclusion that excluded coverage for:

g.  (1)  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:

(a)  At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any insured[.]

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

The umbrella policy included identical language. "Pollutants" are defined under both policies as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed."

Church Mutual was notified of John's death and Cheryl's injuries on November 20, 2009. That same day, Church Mutual retained attorney Jerald Rauterkus. The parties dispute the purpose for which Rauterkus was hired. Church Mutual contends that Rauterkus's role was limited to conducting a cause-and-origin investigation of the carbon monoxide leak and assisting the Church in matters of communication during the course of the investigation. The Greens assert that Rauterkus was hired to defend the Church against liability claims.

The parsonage's heating system was inspected and tested on three separate occasions from November 2009 to April 2010. The results of the inspections were inconclusive. Although it was evident that the carbon monoxide had been emitted from the parsonage's heating system, the exact source and cause of the carbon monoxide leak were not clear. There was minimal communication between the parties following the third inspection.

In March 2011, the parties resumed communicating when Rauterkus received requests for additional information from attorney Peter Wegman, who had been hired by the Greens to assist in their representation.[2] After exchanging correspondence, Wegman sent Rauterkus a demand letter on August 19, 2011, seeking policy limits for John's death and Cheryl's bodily injuries. In response, Church Mutual filed a declaratory judgment action on September 7, 2011, seeking a determination that the policies' pollution exclusions precluded any duty on its part to defend or indemnify

---

[2]Wegman served as co-counsel with Scott Grafton, the attorney the Greens had retained in December 2009 or January 2010.

the Church with respect to the Greens' claims. Church Mutual also sent the Church a reservation of rights letter denying coverage on the basis of those exclusions.

In February 2012, the Church and the Greens entered into a consent agreement in which the Greens agreed not to "pursue or collect on any of [the Church's] assets or assets of any members of the Church, except for any rights to indemnity under any insurance policies[.]" In exchange, the Church assigned to the Greens all rights it had under its insurance policies.

As the declaratory judgment action progressed in the district court, the Greens disclosed their intent to have a chemist testify as an expert witness regarding whether carbon monoxide is an "irritant" or "contaminant." Church Mutual moved in limine to exclude the chemist's testimony and then later moved for summary judgment. The district court granted both motions, having concluded that the pollution exclusions were unambiguous, that carbon monoxide was a "pollutant" as defined by the policies, and that the Greens' claims thus were not covered under the plain terms of the policies. Additionally, the district court rejected the Greens' contention that Church Mutual was estopped from denying coverage because of its delay in reserving its rights.

## II. Discussion

"We review *de novo* a district court's interpretation of an insurance policy and its grant of summary judgment." Eichholz v. Secura Supreme Ins. Co., 735 F.3d 822, 825 (8th Cir. 2013). Summary judgment is proper if "the record, when viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Langley v. Allstate Ins. Co., 995 F.2d 841, 844 (8th Cir. 1993). "[W]hen federal courts are exercising diversity jurisdiction, the rules for construing insurance policies are controlled by state law." Id. The parties agree that Nebraska law controls in this

-4-

case. "In interpreting state law, 'we are bound by the decisions of the state's highest court.'" Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 534 (8th Cir. 2006) (quoting Eichenwald v. Small, 321 F.3d 733, 736 (8th Cir. 2003)). "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue." Cont'l Cas. Co. v. Advance Terrazzo & Tile Co., Inc., 462 F.3d 1002, 1007 (8th Cir. 2006).

## A. Pollution Exclusions

The Greens contend that the district court erred in concluding that the pollution exclusions were unambiguous and barred coverage of the Greens' claims. "The interpretation of an insurance policy is a question of law." Countryside Coop. v. Harry A. Koch Co., 790 N.W.2d 873, 881 (Neb. 2010). "Under Nebraska law, a court interpreting a contract, such as an insurance policy, must first determine, as a matter of law, whether the contract is ambiguous." Reisig v. Allstate Ins. Co., 645 N.W.2d 544, 550 (Neb. 2002). "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." Id. If an insurance policy is ambiguous, it "will be construed in favor of the insured." Id. In contrast, "[w]hen the terms of an insurance contract are clear, the court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them." Lovette v. Stonebridge Life Ins. Co., 716 N.W.2d 743, 747 (Neb. 2006).

The Greens argue that the terms "irritant" and "contaminant," as used in the policies' definition of "pollutants," are ambiguous. Although the Nebraska Supreme Court has not addressed whether these specific terms create ambiguity in a pollution exclusion, its decision in Cincinnati Insurance Co. v. Becker Warehouse, Inc., 635 N.W.2d 112 (Neb. 2001), points to the conclusion that it would likely reach if the issue were presented to it.

-5-

In Cincinnati Insurance Co., the owners of food products stored in a warehouse sued the owner of the warehouse, alleging that their food products had been contaminated by xylene fumes from a floor sealant that had been applied to the warehouse's concrete floor. The warehouse owner filed claims with its insurer, seeking indemnity and defense against these claims. The insurer denied coverage on the basis of a pollution exclusion nearly identical to the pollution exclusions at issue in this case, but additionally including "[p]ollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment." See id. at 116. In response to the insurer's declaratory judgment action, the warehouse owner argued that the pollution exclusion was ambiguous and that it applied only to traditional environmental pollution claims.

The Nebraska Supreme Court concluded that although the pollution exclusion was "quite broad," it was unambiguous and was not limited to traditional environmental damage. Id. at 120. In rejecting the warehouse owner's arguments, the court recognized that the "majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants." Id. at 118. Continuing, the court stated:

> The broad nature of the pollution exclusion may cause a commercial client to question the value of portions of its commercial general liability policy, but, as an appellate court reviewing terms of an insurance contract, we cannot say that the language of the pollution exclusion is ambiguous in any way. The language in the instant pollution exclusion is clear and susceptible of only one possible interpretation.

Id. at 120.

The Greens seek to distinguish <u>Cincinnati Insurance Co.</u> on the ground that the ambiguity alleged in that case was not based on the terms "irritant" or "contaminant." Nevertheless, the decision in <u>Cincinnati Insurance Co.</u> suggests that, given its conclusion that the entirety of the exclusion was broad and unambiguous, the Nebraska Supreme Court would reject the Greens' contention that the terms "irritant" and "contaminant" as used within Church Mutual's policies are ambiguous.[3] We note that in <u>State Farm Fire & Casualty Co. v. Dantzler</u>, 842 N.W.2d 117, 120-21 (Neb. Ct. App. 2013), the Nebraska Court of Appeals recently concluded that the holding in <u>Cincinnati Insurance Co.</u> applied with equal force to the interpretation of the pollution exclusion provision in the case before it.

We turn, then, to the question whether the Nebraska Supreme Court would conclude that carbon monoxide constitutes a "pollutant" under the policies.[4] We hold that it would so conclude. The policies define "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant . . . ." As previously discussed, the pollution exclusions, including the terms "irritant" and "contaminant," are

---

[3]Citing <u>Sargent Construction Co., Inc. v. State Auto Insurance Co.</u>, 23 F.3d 1324 (8th Cir. 1994), and <u>First Realty, Ltd. v. Frontier Insurance Co.</u>, 378 F.3d 729 (8th Cir. 2004), the Greens argue that the Eighth Circuit has found the phrase "irritant or contaminant" as used within a pollution exclusion to be ambiguous. Because these cases were decided under Missouri law and Iowa law, they have no bearing on our resolution of this issue. Moreover, subsequent to <u>First Realty</u>, the Iowa Supreme Court concluded that pollution exclusions that included the same definitions of "pollutants" were unambiguous. <u>Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.</u>, 728 N.W.2d 216 (Iowa 2007).

[4]Church Mutual argues that in <u>Harleysville Insurance Group v. Omaha Gas Appliance Co.</u>, 772 N.W.2d 88 (Neb. 2009), the Nebraska Supreme Court held that carbon monoxide constituted a "pollutant" under a pollution exclusion that included an identical definition of "pollutants." The parties in <u>Harleysville</u> did not dispute whether carbon monoxide was a pollutant, however, and thus the court was not required to, and did not, render a holding on that issue.

unambiguous. These terms thus should be accorded their plain and ordinary meanings. "Contaminant" is defined as "something that contaminates." Webster's Third New International Dictionary 491 (2002). In turn, "contaminate" is defined as "to render unfit for use by the introduction of unwholesome or undesirable elements." Id. Because carbon monoxide is a gas that can render air "unfit for use" if introduced at high levels, it constitutes a "pollutant" as defined by the policies.

In contesting whether carbon monoxide constitutes a "pollutant," the Greens assert that the district court erred in granting Church Mutual's motion in limine to exclude the testimony of their expert witness regarding whether carbon monoxide is an "irritant" or "contaminant." "We review the district court's decision concerning the admission of expert opinions for an abuse of discretion." Khoury v. Philips Med. Sys., 614 F.3d 888, 892 (8th Cir. 2010) (quoting Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057 (8th Cir. 2005)). As noted above, the interpretation of an insurance policy is a question of law for the court, not a question of fact. See R.W. v. Schrein, 652 N.W.2d 574, 579 (Neb. 2002) (per curiam) (concluding that the meaning of a word in a contract "is a question of law, on which expert testimony has no bearing"). The district court thus did not abuse its discretion in excluding the testimony of the Greens' expert.[5]

## B. Estoppel

The Greens argue that even if the pollution exclusions apply, Church Mutual is nonetheless estopped from denying their claims. Under Nebraska law, "the doctrine of estoppel [generally] may not be used to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom." First

---

[5]In Dantzler, a chemical toxicologist offered unrefuted testimony that exposure to lead has adverse effects on humans and that lead is defined as a pollutant by the Environmental Protection Agency. 842 N.W.2d at 122. Whether the court could consider the expert's testimony, however, was not at issue. Id.

United Bank of Bellevue v. First Am. Title Ins. Co., 496 N.W.2d 474, 480 (Neb. 1993) (hereinafter Bank of Bellevue). An exception to this general rule "applies when an insured is able to show (1) that the insurer had sufficient knowledge of facts or circumstances indicating non-coverage, (2) that the insurer assumed or continued defense of the insured without obtaining an effective reservation of rights agreement, and (3) that the insured suffered some type of harm or prejudice." Id. If the exception applies, the insurer "may be estopped from subsequently raising the defense of non-coverage." Id. These elements must be proved by clear and convincing evidence. See Double K, Inc. v. Scottsdale Ins. Co., 515 N.W.2d 416, 422 (Neb. 1994).

The Greens argue that there are genuine issues of material fact as to each element of the exception, and thus they assert that the district court erred in granting summary judgment in favor of Church Mutual. Although Church Mutual concedes that "it was apparent from the outset that the incident involved exposure to carbon monoxide" and that there "has never been any question regarding the pollution exclusions being included in the [multi-peril and umbrella] policies," it nonetheless asserts that the Greens cannot establish the first element of the exception. Church Mutual argues that until it received the demand letter in August 2011, it did not know whether the Greens would bring a claim against the Church, and, if they did, whether the claim would be for liability or for workers' compensation.[6] Given Church Mutual's concessions, we will assume that a genuine issue of material fact exists with respect to the first element.

Next, the Greens argue that they have set forth sufficient evidence for a reasonable jury to find by clear and convincing evidence that Church Mutual assumed the defense of the Church without obtaining a reservation of rights agreement. They

---

[6]Church Mutual had also insured the Church under a workers' compensation policy, which did not contain a pollution exclusion.

contend that Rauterkus began defending the Church as soon as he was retained by Church Mutual in November 2009. They point to various facts in support of this contention, including portions of Rauterkus's billing records that refer to "coverage questions" that he fielded, his statements to Church elders regarding settlements in similar situations, and his advice to Church elders to not discuss the events of November 19, 2009, with Cheryl Green. The Greens contend that, taken together, this evidence is sufficient to create a jury issue on the second element of the exception.

The record contains evidence that Rauterkus was hired for a limited purpose and that the Church understood Rauterkus's limited role. During his deposition, Church elder Kenneth Spray, the Church's primary contact in the matter, testified: "[Rauterkus] was always very strict on one point. . . . [H]e had nothing to do with the policy. He couldn't interpret the policy, hadn't even seen the policy. As I recall, he just could not respond to any policy, what's in the policy, how does it look type questions." Spray further explained that Rauterkus made it clear that he was hired to investigate the carbon-monoxide incident and that when asked about insurance coverage at a meeting with the Church's Board of Elders, Rauterkus always gave the same line: "[t]hat's not my role in this thing." Finally, Spray testified that Rauterkus's role never changed, stating "[a]ll the way through, he—I never saw him in any other role than managing the investigation."

Rauterkus himself explained the purpose of his retention during his own deposition, testifying that he previously had not done any coverage work for Church Mutual. He also stated that he "hate[d] coverage work" and that he had done coverage work in only three or four cases over the course of his career. When asked what he was hired to do, Rauterkus responded that Church Mutual "[t]old me to do a cause-and-origin investigation." Additionally, when asked in correspondence from the Greens' attorney in March 2011 about coverage under the policies, Rauterkus

replied: "Coverage limits: I have not been retained to provide a coverage opinion on this matter, so I am unable to confirm your coverage interpretation of the policy."

In light of the foregoing testimony, it is hard to say that the Greens have pointed to clear and convincing evidence in support of the second element of the exception. Again, for the purposes of this case we will assume, without deciding, that a triable issue of fact exists with regard to that element.

We turn, then, to the third element, whether the Church was prejudiced by Church Mutual's delayed reservation of rights. The Greens argue that it was, but they neither explain how the Church was prejudiced, nor do they point to any specific examples of harm suffered by the Church. Instead, they argue that Nebraska law does not always require that actual prejudice be shown. They assert that prejudice is presumed under Nebraska law when an insurer, without first reserving its rights, assumes complete control for more than twelve months over a possible claim that calls for cooperation by the insured.

In support of this contention, the Greens first cite National Union Fire Insurance Co. v. Bruecks, 139 N.W.2d 821, 824 (Neb. 1966), in which the driver of a vehicle sustained injuries after a passenger accidentally discharged a firearm while riding in the vehicle. The passenger's father notified his comprehensive liability insurer of the accident immediately after it occurred and was led to believe that he had coverage under the policy and thus left the matter in the insurer's control. Id. When the driver brought suit against the passenger approximately seventeen months later, the insurer denied coverage and then filed suit, seeking a declaration that it had no duty to defend or indemnify the passenger under the terms of the policy. Id. at 823-25. The trial court held, *inter alia*, that the insurer was estopped from denying coverage. Id. at 825.

-11-

On appeal, the Nebraska Supreme Court pointed to the insurer's conduct vis-a-vis the insureds: "Various assurances were given by [the insurer's] representatives to the [insureds]. They were told early in the investigation that the matter was in the hands of the insurance company and they should not worry about it." Id. at 828. It then held that that conduct "was sufficient to constitute a representation, and is a most persuasive argument for the operation of the doctrine of equitable estoppel." Id. In rejecting the insurer's argument that it should not be estopped from denying coverage because there was no evidence that the passenger suffered prejudice, the court concluded that "the [insurer's] assumption of complete control of the matter for a period of 17 months, with the consequent need of cooperation with [the insurer] under the terms of the policy, in itself constitutes a sufficient showing of prejudice." Id. at 829.

The Greens next cite Bank of Bellevue, in which a bank filed a claim with its title insurer after a creditor not listed in the title insurance policy filed a foreclosure action on the insured property, claiming that it had a lien that was superior to all others. 496 N.W.2d at 478. The title insurer accepted the bank's tender of defense without entering into a reservation of rights agreement with the bank. Id. Some twelve months later, the title insurer sent the bank a letter denying the bank's claim. Id. at 479. The bank then sued the title insurer, arguing that the title insurer was equitably estopped from denying coverage. Id.

On appeal, the Nebraska Supreme Court analyzed each of the earlier-described elements of the exception to the general estoppel rule and concluded that each had been satisfied. Id. at 480-82. In addressing the prejudice element of the exception, the court discussed Bruecks and similarly held that "[the title insurer]'s assumption of complete control of a matter involving a possible claim for over 12 months, with the consequent need of cooperation under the terms of the policy, and without a reservation of rights agreement, constitutes a sufficient showing of prejudice as a basis for urging estoppel." Id. at 482. Continuing, the court wrote, "[W]ith

-12-

knowledge, actual or presumed, of facts which would have permitted it to deny coverage, [the insurer] may be estopped from subsequently raising the defense of non-coverage." Id. The court concluded that the bank had suffered actual prejudice because it had been deprived of its opportunity to protect its interests by entering into negotiations with a separate bank that held liens on the property.

The Greens argue that Bruecks and Bank of Bellevue stand for the proposition that proof of actual prejudice is not necessary in the circumstances of this case. They contend that Church Mutual's retention of Rauterkus and Rauterkus's involvement in the case establish that Church Mutual assumed complete control over the case, control that it exercised for a period of approximately twenty-one months before reserving its rights. These facts, the Greens argue, constitute a sufficient showing of prejudice under Nebraska law.

We conclude that the Greens have read Bruecks and Bank of Bellevue too broadly. In addressing prejudice in Bank of Bellevue, the Nebraska Supreme Court specifically found that the bank suffered actual prejudice as a result of the title insurer's conduct. In Bruecks, the insureds had been given assurances, and there was no evidence to rebut a finding of prejudice. In this case, by contrast, Church Mutual has established that the Church suffered no actual prejudice or harm as a result of Church Mutual's delay in reserving its rights. Specifically, the Church was relieved of any legal exposure stemming from the Greens' claims when it entered into the consent agreement with the Greens. Because the Greens can only assert claims that the Church might have had against Church Mutual and because the Church faced no liability for the Greens' claims after the parties entered into the consent agreement, there were no claims that the Greens could assert on behalf of the Church. In cases such as this one, where it is clear that the insured suffered no actual prejudice, we do not believe that the Nebraska Supreme Court would hold that Church Mutual should be estopped from asserting its defense of non-coverage under the pollution

-13-

exclusions.  Accordingly, the district court did not err in rejecting the Greens'
estoppel claim.

## III.  Conclusion

The judgment is affirmed.

———————————————