775 N.W.2d 47 (2009)
278 Neb. 903
STATE of Nebraska, appellee,
v.
Jacob J. DALY, appellant.
No. S-08-192.
Supreme Court of Nebraska.
November 20, 2009.
*55 Dennis R. Keefe, Lancaster County Public Defender, and John C. Jorgensen for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
Jacob J. Daly was convicted at a jury trial of, among other things, operating a motor vehicle while under the influence of marijuana.[1] The primary issue presented in this appeal is the admissibility of a police officer's opinion that Daly was under the influence of drugs while operating his vehicle. We conclude that the officer's opinion was properly admitted, and we affirm Daly's convictions and sentences.

I. BACKGROUND
The vehicle Daly was driving was stopped after Lincoln police officer Christopher Monico observed Daly's car operating without a headlight. Monico smelled burnt marijuana, and he observed that Daly's eyelids were drooping and that his eyes were watery and bloodshot. Daly admitted to having smoked marijuana earlier that day and gave Monico permission to search the vehicle. Monico found, among other things, plastic bags that contained rolling paper, a small scale, and trace amounts of marijuana.
Monico summoned Officer Jesse Hilger, who had completed instruction as a "drug recognition expert" (DRE). After Hilger arrived, Monico conducted field sobriety tests. Daly's results were mixed, and Monico concluded that Daly was unable to safely operate a motor vehicle. Daly was arrested, and Hilger conducted further drug tests pursuant to standardized DRE protocol. A chemical breath test gave no indication that Daly was under the influence of alcohol, but evidence of marijuana use was found in Daly's urine.
*56 Daly was charged by complaint with one count of driving under the influence (DUI), one count of possession of 1 ounce or less of marijuana, and one count of possession of drug paraphernalia. Daly filed a pretrial Daubert/Schafersman[2] motion to determine the admissibility of the State's opinion that Daly had been under the influence of a drug. After an extensive hearing, the county court overruled Daly's motion, and the matter proceeded to a jury trial. Hilger testified at trial to his opinion, based upon Daly's poor coordination and matrix of physical symptoms, that Daly's marijuana usage had impaired him to the point that he was unable to operate a motor vehicle safely. Daly was convicted on all charges and appealed his DUI conviction to the district court, which affirmed the county court's judgment.

II. ASSIGNMENTS OF ERROR
Daly assigns, consolidated and restated, that the trial court erred in the following respects:
(1) Overruling his motion in limine and objection to the admissibility of Hilger's DRE testimony.
(2) Allowing, at the pretrial Daubert/Schafersman hearing, expert testimony from several witnesses who testified regarding the DRE protocol. Generally, Daly argues that these witnesses were not qualified to offer the testimony that the trial court accepted for purposes of the Daubert/Schafersman hearing.
(3) Allowing, at the pretrial Daubert/Schafersman hearing, several exhibits that were supporting materials for the testimony of the witnesses to whom Daly also objected.
(4) Refusing Daly's offer of the resume of Gregory Cody, and refusing to receive cross-examination testimony of Cody and Darrell Fisher, at the pretrial Daubert/Schafersman hearing. The trial court held a consolidated hearing relating to several DUI cases. Because the State proffered Cody's and Fisher's testimony in another case, not Daly's, the court rejected Daly's proffer of evidence relating to their testimony.
(5) Taking the State's offer of two particular exhibits under advisement, but never ruling on the offer or Daly's objections to the exhibits.
(6) Overruling Daly's motion for further "findings of fact" in association with the overruling of his motion in limine.
(7) Overruling Daly's motion to strike a juror for cause because the juror, a parole officer, was an employee of the State of Nebraska.
(8) Initially overruling his Neb. Evid. R. 404[3] objection to the admission of the scale found in Daly's car then, after reconsidering the objection and excluding the evidence, denying his motion for mistrial.
(9) Overruling a motion for mistrial that Daly claims he made during closing argument.
(10) Overruling Daly's motion for new trial and committing cumulative error.

III. STANDARD OF REVIEW
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4] *57 The standard for reviewing the admissibility of expert testimony is abuse of discretion.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

IV. ANALYSIS

1. DAUBERT/SCHAFERSMAN RELIABILITY OF HILGER'S DRE TESTIMONY
Daly's principal contention on appeal is that the court erred in permitting Hilger to testify that in his opinion, Daly was impaired by the use of marijuana. This contention primarily rests on two general contentionsfirst, that the DRE protocol is unreliable, and second, that Hilger's training and experience with the DRE protocol did not provide sufficient foundation for him to render an expert opinion. And Daly makes several other arguments about the conduct of the Daubert/Schafersman hearing. We address Daly's arguments in turn.

(a) DRE Protocol
The DRE program is a nationally standardized protocol for identifying drug intoxication based upon a program first designed by the Los Angeles Police Department. The protocol is designed to identify seven different categories of drugs and the physical symptoms associated with each category. For example, the behavioral symptoms associated with marijuana intoxication are
impaired attention, impaired attention spans, forgetting to do things, forgetting [things] in mid-sentence . . .; inappropriate euphoria, such as laughing or smiling during an incident that's fairly serious; an impaired ability to divide attention, to do more than one thing at the same time, maybe concentrating on colors or lights rather than the overall environment.
Symptoms also include bloodshot eyes; an elevated heart rate; and sometimes, body tremors. Under the DRE protocol, officers are trained in a step-by-step procedure to examine various clinical or physiological indicators to determine what drugs a suspect might have used.
A field DRE examination generally involves making three determinations: first, that a person is impaired and that the impairment is not consistent with alcohol intoxication; second, the ruling in or out of medical conditions that could be responsible for the signs and symptoms; and third, what type of drug is responsible for the impairment. The process is systematic and standardized. A DRE officer uses a "face sheet" to record his or her observationsa standardized form with prepared entries for the various tests and observations the officer must perform.
The process begins with a breath alcohol test; then, if the DRE officer is not the arresting officer, the DRE officer interviews the arresting officer about the circumstances of the arrest and the suspect's behavior. The DRE officer then conducts the preliminary examination. The DRE officer checks the suspect's pulse, does an initial check of the nystagmus (involuntary jerking movements) of the eyes, and checks the suspect's pupil size. And a series of medical questions is typically asked.
Assuming that the suspect appears to be under the influence of drugs and no medical condition is present, the DRE officer *58 proceeds to conduct an eye examination. The officer administers horizontal and vertical gaze nystagmus tests in each eye, and checks for a lack of convergence, or the eye's ability to converge on an object approaching the face. The next step is to conduct the "divided attention" tests, composed of four different tests that are similar to familiar field sobriety tests. The suspect is asked to estimate a period of time while balancing in a particular way, perform a "walk-and-turn" or "walk-the-line" test, perform a one-leg stand test, and perform a "finger-to-nose" test.
The DRE officer then conducts a vital signs examination. The officer rechecks the suspect's pulse and measures the suspect's body temperature and blood pressure. Then the officer conducts a "dark room examination," during which the suspect's pupils are examined under different light conditions. After that, the officer uses a penlight to examine the suspect's mouth and nose for debris, drugs, or physiological changes that can take place with repeated drug use. The next step is a check for muscle tonethe officer evaluates the suspect's voluntary muscles to see if they are abnormally rigid or flaccid. The officer then checks for injection sites and takes the suspect's pulse again. Finally, the examination concludes with an interview of the suspect.
When the examination is concluded, the DRE officer forms an opinion based on his or her observations. Then, the final step in the process is the use of toxicology to analyze samples taken from the suspect for the presence of drugs.
In other words, the underlying principles of the DRE protocol are basic and familiar: gather information from the suspect and measure fundamental physical symptoms and then derive a conclusion about drug or alcohol intoxication from that data. Dr. Zenon Zuk testified for the State that the DRE protocol is based on the well-established concept that drugs cause observable signs and symptoms, affecting vital signs and changing the physiology of the body.
A 1984 study, conducted by the Johns Hopkins University School of Medicine in conjunction with the National Highway Traffic Safety Administration, concluded that under laboratory conditions, the DRE protocol
showed a high degree of accuracy in correctly identifying the drug classes which had been administered to those subjects judged to be intoxicated. Of subjects judged to be intoxicated the correct drug class was identified on 91.7% of occasions. Overall, in 98.7% of instances of judged intoxication the subject had received some active drug. On 7% of occasions of judged intoxication the incorrect drug class was identified, and on 1.3% of occasions the subject had received no active drug. . . .
A field study conducted by the Los Angeles Police Department and the National Highway Traffic Safety Administration found that when DRE's claimed drugs other than alcohol were present, they were detected in blood tests 94 percent of the time. A study performed by the State of Minnesota from 1991 to 1993 found that at least one DRE-predicted drug category was present in 84.5 percent of cases and that the protocol for detecting cannabis intoxication was the most reliable, corroborated by toxicology in 91.8 percent of cases. And a 1994 study performed by the State of Arizona found that DRE decisions were "highly accurate" and that the DRE program, supported by the toxicology laboratory, was "a valid method for detecting and classifying drug-impaired individuals."
Based largely on that data, every court to have considered the issue has concluded that testimony based upon the *59 DRE protocol is admissible into evidence.[7] In Nebraska, our analysis of the issue is governed by the principles announced by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., and adopted by this court in Schafersman v. Agland Coop.[8] Under our Daubert/Schafersman jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.[9]
In determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that might bear on a judge's gatekeeping determination. These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances.[10]

(i) Persuasiveness of Supporting Studies/Risk of Error
Daly makes several arguments with respect to the reliability of the DRE protocol. His primary argument seems to be that the studies mentioned above were not peer reviewed and were methodologically flawed. Daly contends that other studies, suggesting that the DRE protocol is less reliable, were peer reviewed and used more sound methodology.
To begin with, we note that although Daly attacks the credibility of the literature supporting the reliability of the DRE protocol, he cannot contest its existence.[11] And we have observed that a court performing a Daubert/Schafersman inquiry should not require absolute certainty.[12] Instead, a trial court should admit expert testimony if there are good grounds for the expert's conclusion, even if there could possibly be better grounds for some alternative conclusion.[13] And as other courts have noted, the research validating the DRE protocol has been carefully scrutinized at scientific conferences, conventions, workshops, and other forums for the exchange of ideas among those interested *60 in the physiological consequences of drug use.[14] The reason that peer-reviewed publication is valuable is that it places research in the public domain and permits evaluation and criticism. Although not always published in a peer-reviewed journal per se, DRE research has been the subject of considerable scientific scrutiny.[15] As the court in U.S. v. Everett[16] observed, "These writings began in the ate 1970's and have continued to the present. The use of the protocol and its various elements has certainly not been kept a secret nor is there evidence that its proponents have attempted to avoid the limelight."
Nor are the studies that Daly depends upon as dispositive as he asserts. The feature of those studies upon which he reliestheir blind designhas been criticized by others as a fundamental flaw in their methodology.[17] Daly refers us primarily to studies conducted by Stephen J. Heishman and his colleagues from 1996 to 1998.[18] Daly suggests that the Heishman studies indicated at best a 51-percent success rate for DRE accuracy and indicated a success rate of only 44 percent when alcohol-only decisions were excluded.[19]
But in order to make those studies "blind," the DRE protocol was used incompletely. The DRE examiners did not question subjects about recent drug use, nor did they interrogate the subjects to solicit admissions about drug use. Nor was evidence from the arrest available. This means that the blind studies could not realistically predict the scientific reliability of the DRE program in the field because they examined an abbreviated evaluation that is different from the standardized protocol that is actually used.[20]
As the Everett court observed, this "defies the centuries old practice of physicians to take a history of patients in connection with a physical examination."[21] To remove that aspect of the protocol does not provide an accurate test of the protocol itself. Simply put, the fact that suspects may admit to using drugs or may have drug paraphernalia on their persons does not make a protocol that includes those facts less reliable as a diagnostic tool. And more to the point, when the issue is the reliability of the complete DRE protocol as a diagnostic tool for law enforcement officers in the field, the county court did not abuse its discretion in being more persuaded by studies that actually measured the reliability of the complete protocol under field conditions.
We also note that even the 1998 Heishman study concluded that the DRE protocol "is a valid test to identify recent drug use."[22] That study also found that when DRE evaluations were inconsistent with toxicological testing, false negatives were substantially more likely than false positives, including with respect to marijuana *61 use.[23] And even using an incomplete protocol, "DREs are able to detect drug-induced impairment in general," even when they have difficulty discriminating between various drugs.[24]
In other words, to the extent the Heishman studies indicate a higher rate of error than the studies relied upon by the State, that risk is mitigated by the fact that an erroneous DRE evaluation will probably err on the side of the suspect.[25] The risk of a false positive is low. Any risk is mitigated further by the fact that identifying the specific drug that caused a driver's impairment is inessentialthe DUI statute only requires proof that the defendant was under the influence of "any drug" and does not require the drug to be identified by the arresting officer.[26] And finally, we note that the final step in the DRE protocol is the use of chemical testing to confirm the officer's evaluation. In the end, it was not an abuse of discretion to conclude that the available scientific literature supported the admission of DRE-based testimony.

(ii) General Acceptance in Scientific Community
Daly also argues that the DRE protocol is not generally accepted in the scientific community. To support this argument, Daly contends that because the DRE protocol is a technique based upon the human body's reaction to drugs, "the relevant scientific community must include Pharmacologists, Neurologists, Toxicologists, Behavioral Research Psychologists, Forensic Specialists, and Medical Doctors concerned with the recognition of alcohol and drug intoxication."[27] And Daly suggests that the DRE protocol as a whole is the single "theory or technique" that must be generally accepted.
But the DRE protocol, while based in scientific principles, is a program designed to meet the specific needs of law enforcement. The medical community would rely on toxicological testing, because medical diagnosis and treatment require neither evaluation of a patient's impairment at a particular time nor probable cause to perform a chemical test. And scientists interested in the effects of drugs on the human body would test those effects under controlled conditions, rather than collecting research subjects out of motor vehicles. In other words, the DRE program as a whole cannot be evaluated based on whether it is used in the scientific community, because it is uniquely tailored to the exigencies of law enforcement.
Instead, the relevant question is whether the tests that make up the protocol are generally accepted. In that regard, Zuk testified that each step in the DRE protocol reflected techniques that were accepted in the medical community for diagnostic purposes and were either consistent with the medical community's method of performing those examinations of based on a sound understanding of the central nervous system. And as previously noted, the entire protocol is based on the generally accepted principle that drugs affect vital signs and change the physiology of the body.
Nonetheless, Daly takes issue with several of the particular components of the DRE protocol. He argues, for instance, that nystagmus testing is an unreliable *62 gauge of a suspect's impairment. He argues that several of the physical sobriety tests have not been proved reliable. And he takes particular issue with the examination of a suspect's mouth and nose for evidence of drug use.
We have, however, previously held that nystagmus testing is generally accepted in the relevant scientific community as an indicator of impairment, although that result standing alone is insufficient to support a conviction for DUI.[28] It is also within the expertise of a veteran police officer to have observed that repeated drug use can have physical manifestations such as scarring or discoloration around the mouth. And the variables that could account for anomalous results on any one aspect of the DRE examination are precisely why the protocol existsto promote a systematic approach that considers a number of different factors.[29] The issue is not whether any single observation is reliable enough to be dispositiveinstead, it is whether an opinion based upon all of the relevant observations is reliable enough to be admissible. And, as discussed above, the scientific literature supports the conclusion that it is.
In sum, we conclude that the county court did not abuse its discretion in concluding that the DRE protocol was a sufficiently valid methodology to support Hilger's opinion testimony.

(b) Expert Witness Testimony
Daly makes several arguments with respect to the testimony of the State's various expert witnesses. Primarily, of course, he focuses on Hilger's opinion testimony. So we begin by examining the standards for training a DRE.

(i) Hilger's DRE Training and Opinion Testimony
The first step in training a DRE officer is a 2-day preliminary training program, called "preschool," which prepares students for the more rigorous training to follow. DRE school itself involves 7 days of classroom instruction, including lectures on physiology and toxicology, specific training on the effects of particular drugs, hands-on exercises in implementing the DRE procedure and interpreting the results, and oral and written examinations. Finally, the certification phase of the training requires students to apply the training in real-world settings on actual suspects under the supervision of a DRE instructor. For a student to be certified, a minimum of 12 evaluations must be completed, involving at least three different categories of drug, and verified by toxicology in at least 75 percent of the cases. At least two different DRE instructors must approve and recommend the student for certification. Certification requires the student to pass a comprehensive, 3- to 4-hour final examination. And continuing education is required to maintain certification.
The record establishes that Hilger had been trained in accordance with national standards. And Hilger testified that he performed the DRE protocol as he had been trained to do. Daly does not argue on appeal that Hilger performed the protocol deficiently. Instead, Daly simply asserts that a police officer is not qualified to opine on drug intoxication, because a police officer is not a medical doctor or other expert in "drugs, the eyes, vital signs, psychomotor capabilities, symptomology of drugs, [or] human physiology."[30]
*63 But in this case, Hilger was not asked to opine as to why or how Daly's use of marijuana caused symptoms of intoxication. It is well established, for instance, in the context of alcohol intoxication, that sufficient foundation may be laid for a police officer to testify to his or her opinion that a driver was under the influence of alcohol.[31] In that context, acceptable foundation includes training to detect the physical and mental effects of alcohol, experience in doing so, and the officer's account of the procedures undertaken to evaluate the driver's intoxicated condition.[32] This is because a police officer need neither explain nor know why consumption of alcohol causes certain symptoms in order to be able to identify those symptoms and reach a conclusion based upon them.
Daly offers us no persuasive basis to distinguish drug intoxication, other than taking issue with the substance of the officer's training and procedures. But we conclude that a law enforcement officer with the training and experience offered by DRE certification is sufficiently qualified to testify, based on his or her evaluation, that a suspect was under the influence of drugs. Hilger had successfully completed DRE training, and his opinion was admissible.
In a related contention, Daly claims that there is a difference between intoxication and impairment and that Hilger should not have been permitted, based on a DRE examination, to testify that Daly's ability to drive was impaired. We have said that as used in § 60-6,196, the phrase "under the influence of alcohol or any drug" requires the ingestion of alcohol or drugs in an amount sufficient to impair to any appreciable degree the driver's ability to operate a motor vehicle in a prudent and cautious manner.[33] And we have held that whether impairment is caused by alcohol or drugs, a conviction for DUI may be sustained by either a law enforcement officer's observations of a defendant's intoxicated behavior or the defendant's poor performance on field sobriety tests.[34] The court did not err in permitting Hilger to testify, based upon his observation of Daly and his law enforcement experience, that Daly's ability to drive was impaired.
Daly also contends that the DRE protocol is flawed because it depends on police officers, who he argues are inadequately trained to implement the protocol. And Daly argues that there is no data to show "inter-rater reliability,"[35] which we understand to refer to the ability of different DRE's to successfully apply the protocol. But the qualifications of the officers applying the protocol do not bear on the validity of the protocol itself. Instead, the question is simply whether Hilger, the DRE officer who actually tested Daly and testified at trial, was qualified to render his opinion about Daly. In that regard, Daly contends that the DRE training program offers insufficient training in the DRE protocol.
But there is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert.[36] Unless *64 the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.[37] Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.[38] And a witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.[39] We find no clear error in the trial court's conclusion that by virtue of his DRE training and experience, Hilger was qualified as an expert in the recognition of drug intoxication.
Daly asserts, in passing, that foundation for Hilger's opinion was lacking because there was no video recording showing that Hilger's evaluation was performed correctly. But Hilger testified about his evaluation of Daly and was available for cross-examination about whether the evaluation was performed adequately. Such matters as whether vital signs were measured accurately are appropriate subjects for cross-examination. A video recording of the evaluation was not necessary for Hilger's testimony to be admissible.
Daly also argues briefly that "[t]he State has asserted a definition of `drug' as generally being a chemical substance taken into the human body that impairs the ability to operate a motor vehicle safely" and that "[t]his definition is too broad."[40] This is apparently a reference to Hilger's testimony, during which he described the range of substances that the DRE protocol is designed to detect. But Daly did not object to that testimony at trial. And whatever a "drug" might be for purposes of the DRE protocol, it is not disputed that the only drug at issue here was marijuana, which is clearly a drug within the meaning of both the DRE protocol and the DUI statute.[41]
Finally, Daly argues that Hilger's testimony should have been excluded under Neb. Evid. R. 403,[42] which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." The fact that evidence is prejudicial is not enough to require exclusion under rule 403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under rule 403.[43] Hilger's testimony was relevant to whether Daly was operating his vehicle under the influence of marijuana, and his opinion suggested a decision on that basis. It was not unfairly prejudicial, and the court did no abuse its discretion in admitting it.

(ii) Expert Witnesses at Daubert/Schafersman Hearing

Daly also argues that the State's other experts should not have been permitted to testify at the Daubert/Schafersman hearing. His arguments present something of a moving target: He seems to be contending that the police officer who helped develop *65 the DRE protocol should not have been permitted to testify because he was not a medical expert; an optometrist should not have been permitted to testify because he was not a medical doctor; Zuk, a medical doctor, should not have been permitted to testify because he was not a specialist; and a toxicologist should not have been permitted to testify because she was not an expert on impaired driving.
But each witness testified to relevant issues that were within their competence. Thomas Page, the police officer who helped develop the DRE protocol, testified about how the protocol was developed, the steps involved, and the literature that supports its validity. Karl Citek, an optometrist and associate professor, has a degree in physics from Columbia University and a doctor of optometry degree and a master of science and Ph.D. in vision science from the State University of New York College of Optometry. Citek coauthored two journal articles about the use of nystagmus testing to detect impairment in drivers,[44] and he testified about nystagmus observation and its use in detecting impairment. Michelle Spirk, a forensic toxicologist, testified about the physiological effects of marijuana intoxication, specifically on the ability to operate a motor vehicle. And as described above, Zuk testified as a medical doctor about the medical validity of the steps in the DRE protocol.
The witnesses' testimony was sufficiently related to their research and experience. Furthermore, a trial court has broad discretion in determining how to perform its gatekeeper function,[45] and we presume in the absence of anything to the contrary that a trial court considered only competent and relevant evidence in rendering a decision.[46] Given the nature and scope of the pretrial hearings, we cannot find that the trial court abused its discretion in permitting the witnesses to testify. The trial court was certainly capable of determining the effect the witnesses' qualifications should have on the weight to be afforded their testimony, and we find no abuse of discretion in the court's conclusions.
Daly also argues that Thomas Schwarten, a DRE instructor with the Nebraska State Patrol, should not have been permitted to testify about Hilger's DRE certification and proficiency. But the ultimate issue to be determined at the Daubert/Schafersman hearing was whether Hilger's DRE training qualified him to testify that Daly was under the influence of drugs. Schwarten was qualified to testify as an expert in DRE instruction, and his testimony about Hilger's training, and successful completion of that training, was relevant.

(c) Evidentiary Issues at Daubert/Schafersman Hearing

(i) Field Sobriety Test Studies
Daly also objected to several exhibits that were entered into evidence at the Daubert/Schafersman hearing. First, Daly complains about "Exhibits 20 through 26," which he describes as "validation studies in regards to standardized field sobriety *66 tests."[47] (Exhibit 20 does not fit this description; we assume that its inclusion in this argument is merely a typographical error in Daly's brief.) Daly argues that
[w]ith the question being the admissibility of the DRE program protocols and/or testimony derived therefrom due to the qualities of proffering a medical diagnosis on the basis of vital sign examination, pupillary examinations, and or toxicologythe basis upon which there may have been research in regards to Horizontal Gaze Nystagmus, the Walk and Turn, the One Leg Stand, is irrelevant.[48]
This argument is not entirely clear to us. Because standard field sobriety tests are included in the DRE protocol, scientific examination of those tests would be relevant. And Page referred to the studies as part of the basis for his testimony regarding the DRE protocol. We find no merit to Daly's assertion that the evidence was irrelevant. Daly also argues that the evidence was hearsay. But the evidence was used as foundation for Page's testimony and was admissible to show the basis for his opinion.[49] Finally, Daly argues that the evidence violated his rights under the Confrontation Clause.[50] He waived this ground for his objection by not raising it in the trial court.[51] And in any event, it is well established that Confrontation Clause rights are trial rights that do not extend to pretrial hearings in state proceedings.[52]

(ii) Demonstrative Exhibits
Daly objected to the admission at the Daubert/Schafersman hearing of exhibit 30, a PowerPoint presentation that was used as a demonstrative exhibit during Citek's testimony. Citek generally testified about the effect of drugs on movement of the eyes. Exhibit 30 included several diagrams, photographs, and videos illustrating some of the terms and concepts described during Citek's testimony, and Citek relied on exhibit 30 for illustration throughout his testimony.
Daly argues on appeal that the exhibit was not relevant and that it was hearsay. But we conclude that it was admissible as a demonstrative exhibit. Demonstrative exhibits are admissible if they supplement a witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial.[53] Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case; that is, where they are irrelevant or where the exhibit's character is such *67 that its probative value is substantially outweighed by the danger of unfair prejudice.[54] And a judgment will not be reversed on account of the admission or rejection of demonstrative evidence unless there has been a clear abuse of discretion.[55]
In this case, exhibit 30 provided helpful illustration of Citek's detailed medical testimony. No unfair prejudice is apparent from the record. And the exhibit was not hearsay because it was not a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[56] Rather, it was simply illustrative of Citek's testimony at the hearingabout which he was cross-examinedand Daly does not contend that the exhibit did not accurately represent and did Citek's testimony. Thus, we conclude that exhibit 30 was an appropriate illustration of Citek's testimony and that the county court did not abuse its discretion by admitting it for purposes of the Daubert/Schafersman hearing.
Daly makes similar arguments with respect to exhibits 41 and 42, which were charts prepared by Spirk listing various drugs and their physiological effects. For similar reasons, we also find those arguments to be without merit.

(iii) Letter From American Optometric Association
Daly also makes relevance, hearsay, and Confrontation Clause arguments with respect to exhibit 32, a letter containing a resolution of the American Optometric Association supporting horizontal gaze nystagmus as a field sobriety test. But the only objection made at the Daubert/Schafersman hearing was that "[t]here's been no showing that [Citek] was present when this was made. . . ." Citek testified that he was a member of the organization, recognized the resolution, and agreed with it. The court did not abuse its discretion in overruling Daly's nonspecific objection, and even if it had, the error would have been harmless.

(iv) Evidence Relating to Cody and Fisher
The Daubert/Schafersman hearing in this case was also applicable to several other pending cases. Because similar issues were pending in other cases on the county court's docket, the parties stipulated to a consolidated Daubert/Schafersman hearing. As a result, some evidence was accepted at the pretrial hearing for some cases, but not for others.
Cody and Fisher were DRE instructors for, respectively, the city of Lincoln and the Nebraska State Patrol. Cody's testimony was offered by the State solely with respect to another case, not Daly's case. Nonetheless, the defense offered Cody's resume into evidence in all the consolidated cases including Daly's. And the defense argued that Cody's cross-examination testimony was relevant in Daly's case as well. Similarly, Fisher was called as a witness solely with respect to yet another case. The county court sustained the State's objections to Daly's proffered evidence.
On appeal, Daly argues that the county court erred in permitting Cody and Fisher to testify as expert witnesses. But because neither witness' testimony was admitted in Daly's case, Daly was not aggrieved by the court's rulings and does not *68 have standing to object to them on appeal.[57]
Daly also argues that the court erred in sustaining the State's relevance objection to Cody's resume. Specifically, Cody's resume included his "rolling log" of DRE examinations. Daly argues that the rolling log was relevant, because it "could be utilized in challenging any assertions of margin of error and/or reliability."[58] But Daly has not explained how it could be utilized to do that. And more to the point, the issue at the Daubert/Schafersman hearing was the general reliability of the DRE protocol as a basis for Hilger's testimony, not the specific proficiency of another officer who did not even examine Daly. The county court did not abuse its discretion in sustaining the State's objection.
Daly's final argument with respect to Cody's and Fisher's testimony is that the court erred in overruling his proffer of their cross-examination testimony. To begin with, it is not clear from the record that Fisher's testimony was offered. Daly's specific offer of proof referenced the docket number of the case in which Cody testified, not the case in which Fisher testified. But regardless, the county court did not abuse its discretion in excluding the testimony as irrelevant. Daly repeats his assertion that the evidence could be "utilized in challenging any assertions of margin of error, inter-rater and intra-rater reliability."[59] He does not explain how the evidence would support such a challenge, nor does he explain how such a challenge would be relevant to the issue presented in Daly's case at the Daubert/Schafersman hearing.
In short, the county court did not abuse its discretion in refusing to consider any evidence relating to Cody or Fisher in Daly's case. Daly's arguments in that regard are without merit.

(v) Failure to Rule on Exhibits 17 and 18
At the conclusion of the Daubert/Schafersman hearing, the State offered into evidence exhibits 17 and 18 respectively, a position statement on DRE's of the Committee on Alcohol and Other Drugs of the National Safety Council and a statement supporting DRE's from the American Bar Association. Daly objected on several grounds. After some argument, the court stated that it would "take them under advisement" and "take a look at what's already been offered." But no ruling on the exhibits appears in the record. Daly argues that the court erred in taking the State's offer under advisement but never ruling on the offer or his objections. Daly complains that the county court's failure to rule on the offer and objections hampers his ability to claim error on appeal.
But the presentation of an adequate record for appellate review is primarily the responsibility of the parties.[60] It is well established that a party who fails to insist upon a ruling to a proffered objection waives that objection.[61] We have explained that
"[i]f when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, *69 or fails to object, or to insist upon a ruling on an objection to the introduction of the evidence, and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, and the evidence is in the record for consideration the same as other evidence."[62]
Daly was entitled to rulings on his objections. But because no request was made for the rulings, Daly waived his objections. His argument on appeal is without merit.

(d) Daly's "Motion for Findings of Fact"
After the county court filed its written ruling that Hilger's opinion was admissible, Daly filed a "Motion for Findings of Fact" asking the court for specific rulings on a number of particular questions. The court denied the motion, and Daly claims on appeal that this was error.
A trial court's gatekeeping duty requires is to adequately demonstrate by specific findings on the record that it has performed that duty, because the losing party is entitled to know that the trial court has engaged in the heavy cognitive burden of determining whether the challenged testimony was relevant and reliable and to a record that allows for meaningful appellate review.[63] And meaningful appellate review requires the court to "`explain its choices' so that the appellate court has an adequate basis to determine whether the analytical path taken by the trial court was within the range of reasonable methods for distinguishing reliable expert testimony from false expertise."[64] So, we explained in Zimmerman v. Powell[65] that
[a] trial court adequately demonstrates that it has performed its gatekeeping duty when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination.
The county court held several pretrial hearings in this case regarding the DRE protocol and eventually entered an 11page order that summarized the history of the DRE protocol, the process of DRE examination, the evidence presented, and the court's findings regarding the reliability of the protocol and the admissibility of Hilger's opinion testimony. The county court's order satisfies the requirements articulated in Zimmerman, demonstrating that the court considered the issues carefully and conscientiously performed its gatekeeping duty.
Daly's appellate argument consists of repeating the assertions he made in his motion, that certain findings were "necessary,"[66] without explaining why they were necessary for the court to perform its gatekeeping function. For instance, Daly claims that "it was necessary to clarify the appropriate definition of `drug,'" "it was necessary to clarify whether any or all of the various 12-step protocols and its varied components collectively and/or individually may be presented regarding intoxication, impairment, or exposure to a particular class of drug or alcohol," and "[i]t was necessary to clarify whether the DRE protocol(s) are deemed as being subject to a specific margin of error, and *70 specifically what the Court determined that margin of error to be."[67]
But those findings were not necessary to resolve the issues presented at the Daubert/Schafersman hearing, nor are they essential to our appellate review. While Daly was entitled to ask the court for clarification on issues he thought were important, he has identified no prejudicial error in the court's failure to answer his questions. The court's findings were more than sufficient to satisfy its gatekeeping duty. We find no merit to Daly's argument to the contrary.

2. TRIAL ISSUES

(a) Overruling of Motion to Strike Juror for Cause
One of the members of the venire was a parole officer employed by the State of Nebraska Department of Correctional Services. Daly moved to strike the parole officer for cause, taking the position that because he was employed by the State of Nebraska, he was an employee of a party to the case. The county court overruled the motion, and Daly exercised a peremptory strike to prevent the parole officer from serving on the jury.
Daly argues that the potential juror should have been stricken for cause, relying on the Court of Appeals' holding in Kusek v. Burlington Northern RR. Co.[68] that employees of a party are ineligible to serve on a jury in a case involving their employer. We question whether the principle stated in Kusek extends to this situation, in which the parole officer was employed by the State's Department of Correctional Services, while Daly was prosecuted by the office of the Lancaster County Attorney. But more importantly, Daly has failed to show that he was prejudiced by the court's denial of his motion.
It is well settled that even the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges.[69] We will not reverse a conviction based on a challenge to a potential juror if that person was not ultimately included on the jury, even if the defendant was required to use a peremptory challenge to remove the person.[70]
Here, Daly argues only that the parole officer should have been stricken for cause. The parole officer did not sit on the jury, and Daly does not argue that any juror who actually sat on the panel was objectionable. In other words, Daly does not argue that the jury was not impartial. The true object of challenges, either peremptory or for cause, is to enable the parties to avoid disqualified persons and secure an impartial jury. When that end is accomplished, there can be no just ground for complaint against the rulings of the court as to the competency of the jurors.[71] Daly's complaint in this case is, therefore, without merit.

(b) Rule 404 Objection to Scale Found in Daly's Car
Before trial, Daly moved to exclude the scale found in Daly's car, based *71 on rule 404. Daly argued that the scale was not relevant to the DUI charge, but would suggest Daly was a repeat drug user. The county court overruled the motion, reasoning that the scale was evidence of the use of marijuana in the car. And at trial, Monico was initially permitted to testify about the presence of the scale in Daly's car.
But after Monico's testimony, the court reconsidered and sustained Daly's objection to the scale. Daly moved for a mistrial, but the court did not declare a mistrial, and instead instructed the jury that
[p]reviously there was some evidence that a scale had been received, was received into evidence. A this point the Court is going to sustain the objection to evidence regarding that scale and I'm going, at this time, [to] tell you to disregard that. It is not considered evidence and you must not consider it.
Daly's first argument on appeal is that the court erred in admitting the scale into evidence. But the court did not admit the scale into evidence. Therefore, the issue is whether the court should have declared a mistrial or whether the court's admonition to the jury was sufficient to cure any prejudice resulting from the mention of the scale.
A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[72] But a mistrial is not necessarily required if the resulting prejudice can be cured by an admonition to the jury.[73] Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material.[74] And the decision whether to grant a motion for mistrial will not be disturbed on appeal in the absence of an abuse of discretion.[75]
Here, the jury was instructed to disregard the scale. And even though it is hard to "unring the bell" in certain instances, absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[76] We find nothing in the record in this case to suggest that the jury could not and did not abide by the court's admonition in a matter such as this. A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial, especially when, as in this case, an objection or motion to strike the allegedly improper material was sustained and the jury was admonished to disregard such material.[77] Daly must prove the alleged error actually prejudiced him, rather than creating only the possibility of prejudice.[78] He has not done so, and under these circumstances, the court did not abuse its discretion in refusing to declare a mistrial.

*72 (c) Alleged Misconduct During Closing Argument
During closing argument, the prosecutor argued that the DRE protocol was used by a number of government agencies around the world. Daly made an objection, and a discussion was held at the bench. Closing argument continued, and another objection and sidebar followed. No ruling on the objections is indicated in the record, and no record was made of either discussion at the bench.
Daly now assigns that the court erred in "overruling [his] Motion for Mistrial regarding the remarks made by the prosecutor in closing argument." But no corresponding motion for mistrial appears in the record. Nor was a motion for mistrial made at the conclusion of the argument.[79] Nor does the record reflect the basis upon which Daly's objections were made.[80] As we explained, under comparable circumstances, in State v. Harris[81]:
It is incumbent upon an appellant to supply a record which supports his or her appeal. . . . In this instance, neither the basis for the objection nor any ruling on the objection appears in the record. This court has held that a party who fails to insist upon a ruling to a proffered objection waives that objection.. . . As the record before us shows neither the basis for [the defendant's] objection nor any ruling on the objection, we conclude that [the defendant] has waived any error in this regard.
Similarly, the record in this case reflects neither the basis for Daly's objection nor a ruling on the objection. Nor does the record show that a motion for mistrial was made or the basis for such a motion. Under these circumstances, we conclude that Daly has waived any error in this regard.

(d) Motion for New Trial and Cumulative Error
Finally, Daly argues that the county court erred in overruling his motion for new trial and that he was denied a fair trial by cumulative error. Daly's argument in this regard is dependent upon the arguments we have already rejected with respect to his other assignments of error. Therefore, we also find his final assignments of error to be without merit.

V. CONCLUSION
The county court did not abuse its discretion in permitting Hilger's opinion testimony or prejudicially err in any other regard. The district court did not err in affirming Daly's conviction and sentence for DUI. The judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] See Neb.Rev.Stat. § 60-6,196 (Reissue 2008).
[2] See, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[3] Neb.Rev.Stat. § 27-404 (Reissue 2008).
[4] State v. Edwards, 278 Neb. 55, 767 N.W.2d 784 (2009).
[5] Id.
[6] Id.
[7] See, U.S. v. Everett, 972 F.Supp. 1313 (D.Nev.1997); State v. Baity, 140 Wash.2d 1, 991 P.2d 1151 (2000); Mace v. State, 328 Ark. 536, 944 S.W.2d 830 (1997); State v. Klawitter, 518 N.W.2d 577 (Minn. 1994); Wooten v. State, 267 S.W.3d 289 (Tex.App.2008); State v. Aleman, 145 N.M. 79, 194 P.3d 110 (N.M.App.2008), cert. denied 145 N.M. 255, 195 P.3d 1267; State v. Kanamu, 107 Hawai`i 268, 112 P.3d 754 (Haw.App.2005); State v. Sampson, 167 Or.App. 489, 6 P.3d 543 (2000); Williams v. State, 710 So.2d 24 (Fla.App. 1998).
[8] See, Daubert, supra note 2; Schafersman, supra note 2.
[9] State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006).
[10] State v. Fernando-Granados, 268 Neb. 290, 682 N.W.2d 266 (2004). See, also. King v. Burlington Northern Santa Fe Ry. Co., 277 Neb. 203, 762 N.W.2d 24 (2009).
[11] See Sampson, supra note 7.
[12] King, supra note 10.
[13] See id.
[14] See, Everett, supra note 7; Aleman, supra note 7.
[15] See Aleman, supra note 7.
[16] Everett, supra note 7, 972 F.Supp. at 1324.
[17] See, id.; Sampson, supra note 7; Williams, supra note 7.
[18] See, Stephen J. Heishman et al., Laboratory Validation Study of Drug Evaluation and Classification Program: Alprazolam, d-Amphetamine, Codeine, and Marijuana, 22 J. Analytical Toxicology 503 (1998); Stephen J. Heishman et al., Laboratory Validation Study of Drug Evaluation and Classification Program: Ethanol, Cocaine, and Marijuana, 20 J. Analytical Toxicology 468 (1996).
[19] See id.
[20] See Williams, supra note 7. See, also, Everett, supra note 7.
[21] Everett, supra note 7, 972 F.Supp. at 1322.
[22] Heishman et al., supra note 18 at 513.
[23] See id.
[24] See id.
[25] See, Everett, supra note 7; Sampson, supra note 7; Williams, supra note 7. Cf. Aleman, supra note 7.
[26] See, § 60-6,196; State v. Falcon, 260 Neb. 119, 615 N.W.2d 436 (2000).
[27] Brief for appellant at 35.
[28] See State v. Baue, 258 Neb. 968, 607 N.W.2d 191 (2000).
[29] See, Everett, supra note 7; Klawitter, supra note 7.
[30] Brief for appellant at 30.
[31] See, State v. Howard, 253 Neb. 523, 571 N.W.2d 308 (1997); State v. Dail, 228 Neb. 653, 424 N.W.2d 99 (1988).
[32] See id.
[33] See, Falcon, supra note 26; State v. Green, 238 Neb. 328, 470 N.W.2d 736 (1991).
[34] See id.
[35] Brief for appellant at 40.
[36] See Norman v. Ogallala Pub. Sch. Dist., 259 Neb. 184, 609 N.W.2d 338 (2000).
[37] Id.
[38] See Vilcinskas v. Johnson, 252 Neb. 292, 562 N.W.2d 57 (1997).
[39] Crawford v. Department of Motor Vehicles, 246 Neb. 319, 518 N.W.2d 148 (1994).
[40] Brief for appellant at 47.
[41] See, Neb.Rev.Stat. § 28-405 (Reissue 2008); § 60-6,196; Falcon, supra note 26.
[42] Neb.Rev.Stat. § 27-403 (Reissue 2008).
[43] See Robinson, supra note 9.
[44] See, Karl Citek et al., Nystagmus Testing in Intoxicated Individuals, 74 Optometry 695 (2003); Edward M. Kosnoski et al., The Drug Evaluation Classification Program: Using Ocular and Other Signs to Detect Drug Intoxication, 69 J. Amer. Optometric Assn. 211 (1998).
[45] See State v. Aguilar, 268 Neb. 411, 683 N.W.2d 349 (2004).
[46] See, e.g., Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
[47] Brief for appellant at 51.
[48] Id.
[49] See, Neb. Evid. R. 703, Neb.Rev.Stat. § 27-703 (Reissue 2008); Koehler v. Farmers Alliance Mut. Ins. Co., 252 Neb. 712, 566 N.W.2d 750 (1997); State v. Simants, 248 Neb. 581, 537 N.W.2d 346 (1995).
[50] See U.S. Const. amend. VI.
[51] See Robinson, supra note 9.
[52] See, Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). See, e.g., State v. Timmerman, 218 P.3d 590 (Utah 2009); State v. Rivera, 144 N.M. 836, 192 P.3d 1213 (2008); Gresham v. Edwards, 281 Ga. 881, 644 S.E.2d 122 (2007); State v. Woinarowicz, 720 N.W.2d 635 (N.D.2006); Sheriff v. Witzenburg, 122 Nev. 1056, 145 P.3d 1002 (2006); Whitman v. Superior Court (People), 54 Cal.3d 1063, 820 P.2d 262, 2 Cal.Rptr.2d 160 (1991); State v. Sherry, 233 Kan. 920, 667 P.2d 367 (1983); Mitchell v. State, 84 Wis.2d 325, 267 N.W.2d 349 (1978).
[53] State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007).
[54] Id.
[55] See id.
[56] See Neb. Evid. R. 801, Neb.Rev.Stat. § 27-801 (Reissue 2008).
[57] See, State v. Vasquez, 271 Neb. 906, 716 N.W.2d 443 (2006); Smith v. Lincoln Meadows Homeowners Assn., 267 Neb. 849, 678 N.W.2d 726 (2004).
[58] Brief for appellant at 58.
[59] Id. at 59.
[60] R.W. v. Schrein, 264 Neb. 818, 652 N.W.2d 574 (2002).
[61] See, State v. Dean, 270 Neb. 972, 708 N.W.2d 640 (2006); Schrein, supra note 60.
[62] State v. Nowicki, 239 Neb. 130, 134, 474 N.W.2d 478, 483 (1991) (emphasis omitted). Accord Schrein, supra note 60.
[63] See Zimmerman v. Powell, 268 Neb. 422, 684 N.W.2d 1 (2004).
[64] Id. at 430, 684 N.W.2d at 9.
[65] Id. at 430-31, 684 N.W.2d at 9.
[66] Brief for appellant at 62.
[67] Id. at 62-63 (emphasis omitted).
[68] Kusek v. Burlington Northern RR. Co., 4 Neb.App. 924, 552 N.W.2d 778 (1996).
[69] See State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007). See, also, Rivera v. Illinois, ___ U.S. ___, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009).
[70] Hessler, supra note 69.
[71] State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001); State v. Rife, 215 Neb. 132, 337 N.W.2d 724 (1983).
[72] State v. Mason, 271 Neb. 16, 709 N.W.2d 638 (2006).
[73] State v. Gartner, 263 Neb. 153, 638 N.W.2d 849 (2002).
[74] See State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006).
[75] See State v. Floyd, 277 Neb. 502, 763 N.W.2d 91 (2009).
[76] See State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007).
[77] Robinson, supra note 74.
[78] See id.
[79] See, Robinson, supra note 9; State v. Jacob, 253 Neb. 950, 574 N.W.2d 117 (1998).
[80] See State v. Hall, 270 Neb. 669, 708 N.W.2d 209 (2005).
[81] State v. Harris, 263 Neb. 331, 340, 640 N.W.2d 24, 34 (2002) (citations omitted).