Although our reasoning differs from that of the district court, the court did not err in dismissing Bank of the West. We affirm the district court's dismissal of Courtney and Bank of the West.

## CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment to Wells Fargo, Fannie Mae, and Knapstein, and we affirm the dismissal of Courtney and Bank of the West.

AFFIRMED.

STEPHAN and MILLER-LERMAN, JJ., not participating.

———————————

STATE OF NEBRASKA, APPELLEE, V.
ANTHONY D. DAVIS, APPELLANT.
___ N.W.2d ___

Filed May 8, 2015.    No. S-14-508.

1. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

2. **Convictions: Evidence: Appeal and Error.** In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

3. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

4. **Motions for Mistrial: Motions to Strike: Proof: Appeal and Error.** Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

5. **Appeal and Error.** When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.

6. **Criminal Law: Trial.** In some cases, the damaging effect of an event during trial may be such that it cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

7. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.
8. **Criminal Law: Pretrial Procedure.** After a proper request by the defendant, the State is required to disclose all material information.
9. **Criminal Law: Pretrial Procedure: Motions for Mistrial.** The failure of the State to disclose properly requested information could potentially impact the defendant's ability to receive a fair trial to such a degree that a mistrial may be necessary.
10. **Criminal Law: Evidence: Appeal and Error.** In reviewing a claim that the evidence was insufficient to support the verdict, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
11. **Evidence: Appeal and Error.** As with any sufficiency claim, regardless whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Kelly M. Steenbock for appellant.

Jon Bruning, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

Heavican, C.J.

## I. NATURE OF CASE

Miguel Avalos and two of his sons were shot to death in their Omaha, Nebraska, home during an apparent home invasion robbery. Avalos was a known drug dealer. The attempted robbery was allegedly orchestrated by Greg Logemann, another drug dealer in the area. Logemann contacted the defendant, Anthony D. Davis, and another individual, Timothy Britt, about the opportunity to rob Avalos.

At Davis' trial, multiple witnesses testified to observing that Logemann had pointed out the Avalos home to Davis earlier in the day and also testified that Davis and Britt were at the Avalos home at the time the murders took place. One

witness made an unsolicited comment that Davis had previously been in prison. Another witness' testimony differed substantially from her earlier deposition testimony regarding incriminating statements made by Davis about the murders. On both occasions, Davis moved for a mistrial. The district court denied both motions.

Davis was convicted of three counts of first degree murder and three counts of use of a deadly weapon to commit a felony, and he was sentenced to three life sentences and 75 to 90 years' imprisonment. Davis now appeals. We determine that the district court did not abuse its discretion in overruling Davis' two motions for mistrial and that the verdicts were not based on evidence that was insufficient to prove Davis guilty beyond a reasonable doubt.

## II. BACKGROUND

### 1. Murders

On July 9, 2012, Avalos and two of his sons were killed inside Avalos' home in Omaha. All three had been shot multiple times and died as a result of their wounds. Avalos' oldest son was in the house in a downstairs bedroom with his wife and child at the time the three were shot upstairs. He testified that he woke up to the sound of gunshots at approximately 3:45 a.m. He locked the door to the bedroom and called the 911 emergency dispatch service, remaining on the telephone until police arrived. Police observed signs of forced entry at one of the entrances to the residence. Inside Avalos' bedroom within the residence, police discovered methamphetamine and over $5,000 in cash. A defaced .40-caliber semiautomatic pistol was also found in the residence.

The State alleges that the three victims were killed by Davis and Britt during an attempted robbery. Logemann testified that he had orchestrated the robbery. Logemann and Avalos were both drug dealers, and Logemann believed Avalos was an easy target. Logemann had previously tried to eliminate Avalos as a competitor by assisting the Omaha Police Department in making controlled drug buys from Avalos. In exchange for his testimony at trial, Logemann was granted use immunity and not charged with the murders. Logemann was charged

with criminal conspiracy to commit robbery, a Class II felony. Logemann admitted to lying to the detectives the first time he spoke with them about the murders, but testified that he told the detectives everything he knew the second time he was interviewed.

Logemann testified that on July 8, 2012, he offered to show Davis where Avalos lived. Davis contacted Crystal Branch, an acquaintance, and asked for a ride. Branch then asked her roommate, Charice Jones, if she would be willing to give Davis a ride. Jones agreed. Branch and Jones drove in Jones' vehicle to Davis' apartment in Council Bluffs, Iowa. According to both Branch and Jones, the two picked up Davis and the group then picked up Logemann.

Branch and Jones both testified that Logemann had Jones drive past the Avalos residence and that Logemann pointed out which house belonged to Avalos. While in the vehicle, neither Branch nor Jones heard anyone mention a potential robbery. According to Branch and Jones, Logemann told them that Logemann saw his sister outside of Avalos' house. Logemann's sister, who purchased drugs from Avalos, testified that she was at Avalos' home on the evening of July 8, 2012, and had observed a "weird dark colored truck" slowly drive by the residence.

Davis, Britt, Branch, and Jones then returned to Jones and Branch's residence. The group remained there until approximately 2 a.m. Branch testified that Davis then told her, "[O]kay we can go now, the guy's home." After stopping for gas, Jones drove Davis, Britt, and Branch back to the Avalos residence in her vehicle. Jones parked the vehicle "a block or two away" from the house. Davis and Britt both exited the vehicle, while Jones and Branch waited inside the vehicle. Both Jones and Branch testified that they believed the two men were going to Avalos' house to purchase more drugs. After approximately 20 minutes, Davis and Britt returned to the vehicle. Branch testified that she saw Davis running back to the vehicle and that Britt came back to the vehicle a few minutes after Davis. Britt was wearing all black and had a handkerchief over his face. Davis had on jeans and a light-colored T-shirt.

At approximately 4 a.m., Davis called Tiaotta Clairday, his ex-girlfriend, several times before she finally answered the telephone. Davis told Clairday that he "really needed" her to pick him up. Clairday testified that Davis sounded nervous. When Clairday arrived, Davis got in the front seat of the vehicle. Clairday testified that Davis admitted to robbing a house and that Davis and the person he was with "just started shooting" when they saw someone coming down the hall. Davis informed Clairday that Britt needed to come along with them too, because Britt had a gun. After Britt got into the vehicle, Britt handed a .22-caliber revolver to Clairday.

Clairday, Davis, and Britt then drove to Larry Lautenschlager's apartment in Council Bluffs. Lautenschlager is another acquaintance of Clairday and Davis. Clairday testified that she gave the gun to Lautenschlager and told him to get rid of it. Clairday then had a private conversation with Davis inside the bathroom of Lautenschlager's apartment. Clairday testified that Davis told her that "some people got shot and that he didn't want [Clairday] by [Britt] by [herself]." After Davis and Clairday left the bathroom, Clairday testified that she observed Britt outside the apartment burning a pair of gloves on the grill.

Davis also allegedly spoke to Logemann about what had occurred. Logemann testified that shortly after the murders, Davis told him that Britt "started flipping out" and began firing his weapon in the hallway of the house. However, Davis gave a different account to Logemann the following day and denied any involvement. Logemann testified that he received a text from Davis the next day "[s]aying that nothing took place [the day before] because his girlfriend found him with another woman." Several days after the incident, Logemann testified that Davis "wanted to know if [Logemann had] heard anything about a gun being dropped at the scene" and that Davis "was worried about his DNA being on the gun."

Clairday testified that several days later, she and Lautenschlager drove out to a concrete mill near Ashland, Nebraska, and put the revolver in a culvert, although Lautenschlager denied helping dispose of the gun. The revolver

was eventually discovered by police in the exact place where Clairday had told police it was located.

Investigators with the Omaha Police Department crime laboratory testified that both .22- and .40-caliber bullets were recovered from the victims' bodies and from inside Avalos' house. The investigators testified that the .22- and .40-caliber bullets were consistent with having been fired from the same models of both the .22-caliber revolver and .40-caliber semi-automatic pistol, respectively, which were recovered by police. However, due to the condition of the bullets, the evidence was inconclusive to establish that the bullets had actually been fired specifically from those two firearms.

On August 20, 2012, Davis was arrested and charged with three counts of first degree murder and three counts of use of a deadly weapon to commit a felony. Davis' jury trial began on February 24, 2014.

## 2. Davis' Motions for Mistrial

Davis' first motion for mistrial occurred during Branch's testimony. During her testimony, Branch made a reference to Davis' having previously been in prison. While on direct examination from the State, the following exchange occurred: "Q. Now, you had stated earlier that you had met . . . Davis when you were teenagers? A. Correct. Q. And you had been pen pals? A. Correct. He was writing me. When he got sentenced to prison, he was . . . ." Davis promptly objected, and the district court sustained the objection. The district court then admonished the jury, instructing the jury to disregard Branch's last answer "in its entirety." Branch never explained why Davis was in prison or how long Davis was incarcerated.

Davis then moved for a mistrial. Davis did not argue that the State was trying to intentionally elicit the information about Davis' previous incarceration from Branch, but that it was impossible for "the bell [to] be unrung" now that the information had been revealed to the jury. Counsel for the State explained that he had previously admonished Branch not to provide any extraneous information in her answers, but did not tell Branch specifically not to mention Davis' previous

incarceration. The district court determined that the admonishment to the jury was sufficient to cure any prejudice and denied the motion for mistrial.

Davis moved for a mistrial a second time during Clairday's testimony. Portions of Clairday's trial testimony were apparently inconsistent with her deposition testimony, as reflected by Davis' questions on cross-examination. Clairday's deposition testimony was never entered as an offer of proof, and the deposition testimony is not included in the appellate record. On cross-examination, Davis did, however, question Clairday about several of her prior inconsistent statements. During her deposition testimony, Clairday stated that Davis told Clairday that "some people were hurt, something happened that shouldn't have happened," but Clairday denied that Davis had made any other statements about the attempted robbery or the murders. On cross-examination, Clairday admitted that her testimony at trial was different from her testimony in her deposition. Clairday explained that she was not trying to be deceptive in her deposition testimony, but that at the time of the deposition, she simply did not remember some of the details recited at trial. Clairday testified that she had been a user of methamphetamine, that she had been under the influence of methamphetamine at the time she spoke with Davis about the incidents, and that she has memory problems, especially when she is nervous.

After it became clear that Clairday's testimony differed from her previous deposition testimony, Davis moved for a mistrial. Davis argued that there had been a discovery violation, alleging that in Clairday's deposition testimony, "there's only one occasion where [Clairday] attributes a statement similar to that to [Davis] under oath." Therefore, according to Davis, Clairday must have communicated with the State at some point after her deposition and the State failed to "advise us of incriminating statements of [Davis] when they [knew] them to be available." The State strongly denied having any meetings with Clairday after the deposition and stated that it "did not have any other information aside from everything that's been provided by this witness in her previous statements, nothing different from meetings." The district court overruled

the motion, because Davis was "effectively cross-examining" Clairday on the inconsistencies between her deposition and trial testimony.

### 3. Convictions and Sentences

The jury found Davis guilty on all charges, and the district court accepted the verdicts. Davis was sentenced to a total of three life sentences and 75 to 90 years' imprisonment. Davis now appeals.

## III. ASSIGNMENTS OF ERROR

Davis assigns that the district court erred in (1) denying Davis' motions for mistrial and (2) supporting verdicts based on evidence insufficient to prove Davis guilty beyond a reasonable doubt.

## IV. STANDARD OF REVIEW

[1] Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.[1]

[2] In reviewing a claim that the evidence was insufficient to support a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[2]

## V. ANALYSIS

### 1. Denial of Motions for Mistrial

#### (a) First Motion for Mistrial

Davis first moved for a mistrial after Branch mentioned that Davis had previously been in prison. Reference to Davis' prior conviction was likely impermissible under both Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2014), and

---

[1] *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

[2] *State v. Sing*, 275 Neb. 391, 746 N.W.2d 690 (2008).

Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008). Davis immediately objected to Branch's testimony, and the district court sustained the objection and admonished the jury to disregard Branch's previous answer. Davis argues that the prejudice from Branch's answer could not be cured by admonishment and that the district court abused its discretion in failing to grant a mistrial.

[3-5] A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[3] An admonishment of the jury is typically sufficient to cure any prejudice. Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material.[4] Therefore, Davis faces the burden of proving that "he was actually prejudiced" by the alleged errors and not merely that "'the errors . . . created a possibility of prejudice.'"[5] When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.[6]

[6] In some cases, the damaging effect of an event during trial may be such that it "cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial."[7] Fleeting, unsolicited remarks by a witness regarding the defendant's previous crimes or time spent in prison, however, are not typically the type of errors that cannot be cured by admonishment. In *State v. Lotter*,[8] we held that an

---

[3] *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[4] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[5] *Id*. at 710, 715 N.W.2d at 546-47.

[6] *Id*. (citing *U.S. v. Wheeler*, 322 F.3d 823 (5th Cir. 2003); *Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000); *State v. Wildenberg*, 573 N.W.2d 692 (Minn. 1998); *State v. Lyons*, 951 S.W.2d 584 (Mo. 1997)).

[7] *State v. Kibbee*, 284 Neb. 72, 102, 815 N.W.2d 872, 896 (2012).

[8] *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999).

admonishment was sufficient to cure any prejudice when a witness testified that she had previously gone to Missouri to bail the defendant out of jail. In *State v. Robinson*,[9] we determined that a reference to the defendant's involvement in prior gang-related crimes, accompanied with an admonishment, did not result in actual prejudice.

[7] There is nothing in the record to suggest that Branch's reference to Davis' previous time in prison influenced the outcome of the case. Branch's testimony was cut off before she revealed the crime or the length of the sentence. We must also assume that the jury followed the district court's instruction and disregarded the answer. "[E]ven though it is hard to 'unring the bell' in certain instances, absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict."[10] It cannot be said that this single mention of Davis' prior conviction influenced the jury to such a degree that the entire outcome of the case is now tainted. The district court did not abuse its discretion in denying Davis' motion for mistrial.

### (b) Second Motion for Mistrial

[8,9] Davis moved for a mistrial a second time after Clairday's testimony allegedly differed substantially from her deposition testimony. Davis alleged that the State had committed a discovery violation when it withheld incriminating statements attributed to Davis. Prior to trial, Davis properly requested the State to disclose "[a]ny and all admissions, statements, confessions or other inculpatory or exculpatory statements or admissions it has procured from [Davis] or any other person relative to this case." After a proper request by the defendant, the State is required to disclose all material information.[11] The failure of the State to disclose such information could potentially impact the defendant's ability to receive a fair trial to such a degree that a mistrial may be necessary.[12]

---

[9] *Robinson, supra* note 5.

[10] *State v. Daly*, 278 Neb. 903, 933, 775 N.W.2d 47, 71 (2009).

[11] See *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002).

[12] See *id*.

Davis argues that the State committed a discovery violation and that the district court abused its discretion in overruling Davis' motion for mistrial.

The record before us on appeal, however, presents no evidence that a discovery violation occurred. There is no other evidence to suggest that Clairday actually had any undisclosed contact with the State. In fact, Clairday's testimony at trial appeared to be a surprise to the State's counsel as well. During a sidebar, counsel for the State adamantly denied knowing Clairday would testify about additional incriminating statements. We find no reason to disagree with the district court's determination that no prosecutorial misconduct had occurred.

Even if prosecutorial misconduct did occur, the extent to which Davis was actually prejudiced is unclear. We have no way of determining how Clairday's deposition testimony actually differed from the hypothetical undisclosed statements. Clairday's deposition testimony is not included in the record on appeal; the deposition testimony can only partially be adduced from Davis' questions on cross-examination. And, as the district court correctly noted, Davis was able to effectively cross-examine Clairday on her prior inconsistent statements. Davis pointed out several instances where Clairday's story had changed between when Clairday initially spoke with police, testified at the deposition, and finally testified at trial. The district court did not abuse its discretion in denying Davis' motion for mistrial.

Davis' first assignment of error is without merit.

## 2. Sufficiency of Evidence

[10,11] Davis assigns that the district court erred in supporting a verdict based on insufficient evidence. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[13] As with any sufficiency claim, regardless whether the evidence is direct,

---

[13] *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[14]

Davis was convicted on three counts of first degree murder and three counts of use of a deadly weapon to commit a felony. Under the felony murder rule, a person is guilty of first degree murder "if he or she kills another person . . . (2) in the perpetration of or attempt to perpetrate . . . robbery . . . or burglary."[15] The elements of the deadly weapon charge simply required the State to prove that Davis used a firearm or other weapon to commit a felony.[16] That charge is separate and distinct from the underlying felony.[17]

The prosecution presented a significant amount of evidence from multiple witnesses to establish that Davis was involved in the robbery attempt that led to the murders. The orchestrator of the robbery, Logemann, testified about Davis' involvement. Logemann testified that he pointed out Avalos' home to Davis the evening of the robbery attempt and murders. Two other witnesses corroborated this portion of Logemann's testimony. The same two witnesses also testified that Davis and Britt were at the scene of the crime at the approximate time the murders occurred.

In addition, Clairday and Logemann both testified to statements and actions by Davis, after the murders, which indicated his involvement. Clairday testified that shortly after the murders occurred, Davis admitted to having taken part in the murders. Clairday also testified that she took a .22-caliber revolver from Davis and Britt and hid the weapon near Ashland. That revolver was later recovered by the police in the area Clairday described. The revolver was consistent with bullets found at the scene of the crime. Logemann testified that Davis admitted to being involved in the murders, but that

---

[14] *State v. Norman*, 285 Neb. 72, 824 N.W.2d 739 (2013).

[15] Neb. Rev. Stat. § 28-303 (Reissue 2008).

[16] Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2014).

[17] § 28-1205(3).

Davis recanted the next day. At trial, Logemann also recalled a conversation he had with Davis several days after the murders about the possibility of a gun being left at the scene. Logemann testified that Davis was concerned that through DNA evidence, investigators would be able to link the gun to Davis as the shooter. The .40-caliber semiautomatic pistol abandoned at the site of the murders was consistent with bullets recovered from the scene.

The prosecution presented a significant amount of evidence to establish Davis' involvement at every step, from the planning stage of the robbery to the actual robbery attempt and murders, to disposing of one of the murder weapons, and to Davis' incriminating statements after the murders occurred. The evidence was sufficient such that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could find that Davis was guilty of all charges beyond a reasonable doubt.

Davis' second assignment of error is without merit.

## VI. CONCLUSION

We affirm Davis' convictions and sentences.

AFFIRMED.